## LAURA E. MATURO *v.* FRANK A. MATURO
### (SC 17776)

Norcott, Katz, Palmer, Vertefeuille, Zarella, Schaller and McLachlan, Js.*

* This case originally was argued before a panel of this court consisting of Justices Norcott, Katz, Vertefeuille, Zarella and Schaller. Thereafter, the court, pursuant to Practice Book § 70-7 (b), sua sponte, ordered that the case be considered en banc. Accordingly, Justices Palmer and McLachlan were added to the panel, and they have read the record, briefs and transcript of oral argument.

The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued September 19, 2008—officially released May 4, 2010

*Robert M. Shields, Jr.*, with whom were *Kenneth J. Bartschi* and, on the brief, *Wesley W. Horton*, for the appellant (defendant).

*Steven D. Ecker*, with whom, on the brief, was *George C. Jepsen*, for the appellee (plaintiff).

*Campbell D. Barrett, Steven R. Dembo, Justine Rakich-Kelly* and *Felicia Depaola*, certified legal intern, filed a brief for the Children's Law Center of Connecticut, Inc., as amicus curiae.

*Opinion*

ZARELLA, J. The defendant, Frank A. Maturo, appeals[1] from the judgment of the trial court dissolving his marriage to the plaintiff, Laura E. Maturo, and entering certain financial orders. The defendant claims that the trial court abused its discretion when it (1) ordered him to pay the plaintiff a fixed percentage of his annual net cash bonus as child support, (2) ordered him to pay

---

[1] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

the plaintiff a fixed percentage of his annual state and federal income tax refunds as additional alimony and child support, and (3) divided the parties' marital assets. The plaintiff responds that the child support award was proper and is consistent with General Statutes § 46b-84.[2] Additionally, the plaintiff argues that the trial court is not bound to consider the child support and arrearage guidelines (guidelines) enacted by the commission for child support guidelines (commission) to implement the statute when the parties' annual income exceeds the income range set forth in the schedule of basic child support obligations (schedule). The plaintiff also argues that the trial court did not abuse its discretion when it ordered the defendant to share 20 percent of his annual tax refund with the plaintiff and 20 percent with his children, respectively, and when it divided the marital property. We reverse in part the judgment of the trial court.

We begin with a brief discussion of the facts found by the trial court and the relevant portions of the dissolution order. The parties were married on May 21, 1988, and are the parents of twin boys born on July 22, 1993. The plaintiff is forty-nine years old and holds a bachelor's degree in psychology from Boston College. Since the couple became parents in 1993, she has been a stay-at-home mother. The defendant is fifty-one years old and holds an undergraduate degree from Yale University and a master's degree in business administration from the Wharton School of Business. The defendant has been employed at the Manhattan office of Merrill Lynch since 1999, working in the area of global equity markets.

The defendant has been successful in his career and the family has enjoyed the financial benefits of his suc-

---

[2] Section 46b-84 provides for child support awards and is more fully described in part I of this opinion.

cess. At the time of the dissolution, the defendant was earning a yearly base salary of approximately $200,000. He also was earning incentive compensation each year consisting of an annual cash bonus and an annual stock bonus, the latter comprised of both stock options and restricted Merrill Lynch stock. The trial court valued the defendant's net cash bonus for his performance in the years 2005, 2004 and 2003 as $489,449.50, $597,137.67 and $500,000, respectively,[3] although the defendant states that his annual bonus historically has been much higher and reached approximately $3.8 million in the years 2000 and 2001.[4] The trial court also valued the defendant's unexercised stock options at the time of the dissolution at $3,529,000, and his restricted stock at $1,850,000.

The parties' total assets were likewise substantial, amounting to almost $18 million, of which approximately $10.65 million was awarded to the plaintiff and approximately $7.1 million to the defendant. The plaintiff's share of the marital assets consisted of the mortgage free $2.55 million marital home and the bulk of the family's liquid assets, including approximately $8.1 million in cash and investment accounts. Of the $7.1 million in assets awarded to the defendant, approximately $5.7 million was in the relatively illiquid form of restricted shares, unexercised stock options, deferred compensation and the balance of a retirement account.

[3] According to the Merrill Lynch compensation summary statements included in the record, the defendant's gross cash bonus for the three years prior to the dissolution proceedings averaged approximately $863,000.

[4] This presumably included both cash and stock. The record shows that the cash portion of the defendant's bonus in the years 2003 to 2005 constituted more than 60 percent of the total award. Applying the same percentage to the defendant's claimed $3.8 million bonus in the years 2000 and 2001, he would have received a cash bonus award during those years of approximately $2.28 million, or $1.368 million after taxes of 40 percent. Accordingly, his net cash bonus award in the years 2000 and 2001 would have been more than double the award he received in the years 2003 through 2005.

The court also awarded the plaintiff alimony in the amount of $1215 per week plus 20 percent of the defendant's annual net cash bonus and 20 percent of any future tax refund that the defendant might receive. The court further ordered the defendant to maintain comprehensive medical insurance benefits for the plaintiff at his expense for the maximum period allowed by law and to obtain a life insurance policy in favor of the plaintiff in the amount of $2 million, authorizing him, however, to reduce the amount of the policy so long as it remained sufficient to meet his payment obligations for alimony and child support.

The court designated the plaintiff as the sole custodian of the parties' two minor children but granted the defendant regular visitation rights. The court based the child custody plan on a five week rotation, during which the children were to be with the defendant from Thursday afternoon through Monday morning three out of the five weeks, and Wednesday afternoon through Thursday morning the other two weeks. Under the court's schedule, this rotation was to continue during summer vacations, except that each parent was granted an exclusive period of two weeks with the children. The effect of the schedule was to place physical custody and responsibility for the children with the plaintiff approximately 60 percent of the time and with the defendant approximately 40 percent of the time.

With respect to child support, the court awarded the plaintiff $636 per week, plus 20 percent of the defendant's annual net cash bonus and 20 percent of any future tax refund that the defendant might receive. The court also ordered the defendant to pay 100 percent of the children's private school tuition until they complete high school and to pay for "all work related day care expenses and summer day camp and extracurricular activities." In addition, the court ordered the defendant to "maintain and pay for all medical and dental insur-

ance for the benefit of the children . . . [and] 100 percent of all unreimbursed medical, dental, orthodontia, optical and psychological expenses." The court did not enter an order regarding payment of the children's college expenses, but reserved jurisdiction to enter such an order at the appropriate time.

In entering the financial orders, the trial court explained that it had considered "all of the statutory criteria set forth in . . . § 46b-84 as to support of a minor child, § 46b-215a-1 et seq. of the Regulations of Connecticut State Agencies, as to child support . . . [and] [General Statutes] § 46b-82, as to the award of alimony . . . ." The court acknowledged, however, that the child support award departed from the schedule contained in the guidelines, which does not address circumstances in which the combined net weekly income of the parties exceeds $4000, because of "the [defendant's] substantial assets, the [defendant's] superior earning capacity, the extraordinary disparity in parental income and the significant and essential needs of the [plaintiff] including, but not limited to, the need to provide a home for the children." The court further noted that it had not considered the defendant's yearly noncash compensation, consisting of $530,000 in stock options and restricted stock for the year 2005, in making the alimony and child support awards. Judgment was entered on June 12, 2006, and this appeal followed.

We begin by setting forth the applicable standard of review. "The well settled standard of review in domestic relations cases is that this court will not disturb trial court orders unless the trial court has abused its legal discretion or its findings have no reasonable basis in the facts. . . . As has often been explained, the foundation for this standard is that the trial court is in a clearly advantageous position to assess the personal factors significant to a domestic relations case . . . ." (Internal quotation marks omitted.) *Simms* v. *Simms*, 283 Conn.

494, 502, 927 A.2d 894 (2007), quoting *Borkowski* v. *Borkowski*, 228 Conn. 729, 739, 638 A.2d 1060 (1994). "In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action." (Internal quotation marks omitted.) *Bender* v. *Bender*, 258 Conn. 733, 740, 785 A.2d 197 (2001). "Notwithstanding the great deference accorded the trial court in dissolution proceedings, a trial court's ruling . . . may be reversed if, in the exercise of its discretion, the trial court applies the wrong standard of law." *Borkowski* v. *Borkowski*, supra, 740. The question of whether, and to what extent, the child support guidelines apply, however, is a question of law over which this court should exercise plenary review. See *In re T.K.*, 105 Conn. App. 502, 506, 939 A.2d 9 ("[t]he application of a statute to a particular set of facts is a question of law to which we apply a plenary standard of review"), cert. denied, 286 Conn. 914, 945 A.2d 976 (2008); *Unkelbach* v. *McNary*, 244 Conn. 350, 357, 710 A.2d 717 (1998) (interpretation of statutory scheme that governs child support determinations constitutes question of law).

I

NET CASH BONUS AWARD

The defendant first claims that the trial court improperly ordered him to pay 20 percent of his annual net cash bonus award as child support. He claims that the order was inconsistent with the guidelines and that the court's proffered justification for its deviation from the guidelines was contrary to law. He further claims that the order was improper because it was not based on the needs of the children and thus amounts to disguised alimony. The plaintiff responds that the trial court is not bound by the guidelines when a couple's income exceeds the maximum amount listed in the schedule.

The plaintiff asserts that, in such cases, the only applicable criteria for setting an appropriate child support award are those set forth in § 46b-84, which grants the trial court broad discretion in determining the amount of child support and allows the court to consider other factors in addition to the financial needs of the child. We conclude that, although the trial court correctly acknowledged the general applicability of § 46b-84 and the guidelines, the child support order was improper because it was inconsistent with the statutory criteria and with the principles expressed in the guidelines.[5] The court ordered an open-ended, variable child support award that constituted an increase, rather than a decrease, in the percentage of the parties' combined net weekly income over that established for families at the upper limit of the guidelines' schedule. In addition, it misapplied the deviation criteria and failed to expressly consider the factors set forth in § 46b-84 (d), thus providing no acceptable rationale for its decision. Accordingly, we conclude that the trial court abused its discretion and that the judgment with respect to the child support orders must be reversed.

A

Governing Statutes and Regulations

The legislature has enacted several statutes to assist courts in fashioning child support orders. Section 46b-84 provides in relevant part: "(a) Upon or subsequent to the annulment or dissolution of any marriage or the entry of a decree of legal separation or divorce, the

---

[5] Both Justice Schaller's concurring opinion and the dissenting opinion mischaracterize the holding in this case when they state, respectively, that "the plurality . . . bases its decision on the presumed authority of the . . . guidelines . . . rather than on statutory authority" and that the plurality concludes that "the guidelines control the trial court's determination of child support" for high income families. To the contrary, we not only recognize, but emphasize, that trial courts must consider the statutory criteria as well as the guidelines when making child support awards.

parents of a minor child of the marriage, shall maintain the child according to their respective abilities, if the child is in need of maintenance. Any postjudgment procedure afforded by chapter 906 shall be available to secure the present and future financial interests of a party in connection with a final order for the periodic payment of child support. . . .

"(d) In determining whether a child is in need of maintenance and, if in need, the respective abilities of the parents to provide such maintenance and the amount thereof, the court shall consider the age, health, station, occupation, earning capacity, amount and sources of income, estate, vocational skills and employability of each of the parents, and the age, health, station, occupation, educational status and expectation, amount and sources of income, vocational skills, employability, estate and needs of the child. . . ."

The legislature also has provided for a commission to oversee the establishment of child support guidelines, which must be updated every four years, "to ensure the appropriateness of child support awards . . . ." General Statutes § 46b-215a.[6] General Statutes § 46b-215c further provides that the updated guidelines issued by the commission shall be submitted to the standing legislative regulation review committee and adopted in accordance with the provisions of chapter 54, the Uniform Administrative Procedure Act, General Statutes § 4-166 et seq. Moreover, the legislature has thrown its full support behind the guidelines, expressly declar-

---

[6] The commission consists of eleven members, including the chief court administrator or his designee, the commissioner of social services or his designee, the attorney general or his designee, the chairpersons and ranking members of the joint standing committee on the judiciary or their designees, a representative of the Connecticut Bar Association, a representative of legal services, a representative of the financial concerns of child support obligors and a representative of the permanent commission on the status of women, all of whom are appointed by the governor. General Statutes § 46b-215a.

ing that "[t]he . . . guidelines established pursuant to section 46b-215a and in effect on the date of the support determination *shall be considered in all determinations of child support amounts* . . . . In all such determinations, there shall be a rebuttable presumption that the amount of such awards which resulted from the application of such guidelines is the amount of support . . . . A specific finding on the record that the application of the guidelines would be inequitable or inappropriate in a particular case, as determined under criteria established by the [commission] under section 46b-215a, shall be required in order to rebut the presumption in such case." (Emphasis added.) General Statutes § 46b-215b (a).

The guidelines are defined as "the rules, principles, schedule and worksheet established under [the applicable sections] of the Regulations of Connecticut State Agencies for the determination of an appropriate child support award . . . ." Regs., Conn. State Agencies § 46b-215a-1 (5). A " '[c]hild support award' " is further defined as "the entire payment obligation of the noncustodial parent, *as determined under the . . . guidelines* . . . ." (Emphasis added.) Id., § 46b-215a-1 (6). The guidelines include a schedule for calculating "the basic child support obligation" for families that have two minor children and a combined net weekly income ranging from $310 to $4000. Id., § 46b-215a-2b (f). The guidelines provide in relevant part that, "[w]hen the parents' combined net weekly income exceeds [$4000], child support awards shall be determined on a case-by-case basis, and the current support prescribed at the [$4000] net weekly income level shall be the minimum presumptive amount." Id., § 46b-215a-2b (a) (2). In "appropriate cases," the guidelines also permit "the entry of a supplemental order . . . to pay a percentage of a future lump sum payment, such as a bonus. Such supplemental orders may be entered only when . . .

the percentage is generally consistent with the schedule
. . . ." Id., § 46b-215a-2b (c) (1) (B) (ii); see also id.,
§ 46b-215a-1 (11) (A) (iii) (permitting, inter alia,
bonuses to be included in calculation of "gross
income"). In accordance with the statutory directives
set forth in General Statutes § 46b-215b (a), the guide-
lines emphasize that the support amounts calculated
thereunder are the correct amounts to be ordered by
the court unless rebutted by a specific finding on the
record that such an amount would be inequitable or
inappropriate. Id., § 46b-215a-3 (a). Any such finding
shall include the amount required under the guidelines
and the court's justification for the deviation, which
must be based on the guidelines' "[c]riteria for deviation
. . . ." Id., § 46b-215a-3 (b); see also General Statutes
§ 46b-215b (a). None of the guidelines suggest that an
increase, rather than a decrease, in the support obliga-
tion in higher income families is appropriate merely
because the noncustodial parent has the greater earn-
ing capacity.[7]

The guidelines are accompanied by a preamble that
is not part of the regulations but is intended to assist

---

[7] Section 46b-215a-3 (b) of the Regulations of Connecticut State Agencies
lists the six criteria that may justify deviation from the presumptive support
amounts as, (1) other financial resources available to a parent "that are not
included in the definition of net income, but could be used by such parent
for the benefit of the child or for meeting the needs of the parent," (2)
"[e]xtraordinary expenses for care and maintenance of the child," (3)
"[e]xtraordinary parental expenses . . . that are not considered allowable
deductions from gross income, but which are necessary for the parent
to maintain a satisfactory parental relationship with the child, continue
employment, or provide for the parent's own medical needs," (4) "[n]eeds
of a parent's other dependents . . . [where] a parent may be legally respon-
sible for the support of individuals other than the child whose support
is being determined," (5) "[c]oordination of total family support" when
considerations involving the division of assets, provision of alimony and
tax planning "will not result in a lesser economic benefit to the child," and
(6) "[s]pecial circumstances" relating to reasons of "equity," including shared
physical custody, extraordinary disparity in parental income, the best inter-
ests of the child and "[o]ther" equitable factors.

in their interpretation. Child Support and Arrearage Guidelines (2005), preamble, § (a), p. i. The preamble states that the primary purpose of the guidelines is "[t]o provide uniform procedures for establishing an adequate level of support for children"; id., § (c) (1), p. ii; and "[t]o make awards more equitable by ensuring the consistent treatment of persons in similar circumstances." Id., § (c) (2), p. ii. The preamble explains that the commission extended the applicable range of the schedule in 2005 to include families with a combined net weekly income of up to $4000, an increase from the combined net weekly income limit of $2500 contained in the 1999 schedule, "to promote consistency in the setting of support orders at all income levels" by taking advantage of more recent data on child-rearing costs that included higher income families. Id., § (e) (6), p. vi.

The preamble further explains that the guidelines are based on the income shares model, which considers the income of both parents and "presumes that the child should receive the same proportion of parental income as he or she would have received if the parents lived together." Id., § (d), p. ii. Children's economic needs do not increase automatically, however, with an increase in household income. Although parents may spend more on their children in absolute dollars as their income grows, thus raising the child's station and standard of living, the income shares model reflects the principle that spending on children as a *percentage* of household income actually declines as family income rises. The preamble specifically notes that "economic studies have found that spending on children declines as a proportion of family income as that income increases, and a diminishing portion of family income is spent on each additional child." Id., § (d), p. iii; see also *Gentile* v. *Carneiro*, 107 Conn. App. 630, 648, 946 A.2d 871 (2008) ("[t]he guidelines are based on the premise that a parent with a high net income pays a

lower percentage of his income for child support as compared to an obligor with a lower net income"). The preamble suggests that spending declines because "families at higher income levels do not have to devote most or all of their incomes to perceived necessities. Rather, they can allocate some proportion of income to savings and other [nonconsumption] expenditures, as well as discretionary adult goods." Child Support and Arrearage Guidelines (2005), preamble, § (e) (4) (A), p. iv; see also *Ford* v. *Ford*, 600 A.2d 25, 30 (Del. 1991) ("When the income of an individual is substantial, he or she will use a smaller percentage of that income to maintain a certain standard of living as compared to an individual with less income. This is because, outside of unusually extravagant lifestyles, only a limited sum can be spent on a standard of living. At some point income is directed less and less towards 'needs' and more and more towards savings or investments and thus becomes part of an individual's estate."); *In re Marriage of Bush*, 191 Ill. App. 3d 249, 261, 547 N.E.2d 590 (1989) ("A large income does not necessarily trigger an extravagant [lifestyle] or the accumulation of a trust fund. A large increase in income will not necessarily result in an equal change in one's [lifestyle]. There are other rational options for an individual with a large income than just conspicuous consumption. The wealthy person may prefer personal frugality, or the enrichment of others through charitable giving, or simply deferring income through tax-delay investments, in order to build an estate."), appeal denied, 129 Ill. 2d 561, 550 N.E.2d 553 (1990). Consequently, the 2005 guidelines, like those that came before them, "incorporate declining percentages at all levels of combined net weekly income . . . consistent with the income shares model . . . ." Child Support and Arrearage Guidelines (2005), preamble, § (e) (4) (B), p. iv.

In sum, the applicable statutes, as well as the guidelines, provide that *all* child support awards must be

made in accordance with the principles established therein to ensure that such awards promote "equity," "uniformity" and "consistency" for children "at *all income levels.*" (Emphasis added.) Id., § (c) (1) and (2), p. ii; id., § (e) (6), p. vi. General Statutes § 46b-84 specifically instructs that courts shall consider various characteristics and needs of the child in determining whether support is required, the amount of support to be awarded and the respective abilities of the parents to provide such support. Although the guidelines grant courts discretion to make awards on a "case-by-case" basis above the amount prescribed for a family at the upper limit of the schedule when the combined net weekly income of the parents exceeds that limit, which is presently $4000; Regs., Conn. State Agencies § 46b-215a-2b (a) (2); the guidelines also indicate that such awards should follow the principle expressly acknowledged in the preamble and reflected in the schedule that the child support obligation as a percentage of the combined net weekly income should decline as the income level rises. Thus, an award of child support based on a combined net weekly income of $8000 must be governed by the same *principles* that govern a child support award based on a combined net weekly income of $4000, even though the former does not fall within the guidelines' *schedule.* Finally, although courts may, in the exercise of their discretion, determine the correct percentage of the combined net weekly income assigned to child support in light of the circumstances in each particular case, including a consideration of other, additional obligations imposed on the noncustodial parent, any deviation from the schedule or the principles on which the guidelines are based must be accompanied by the court's explanation as to why the guidelines are inequitable or inappropriate and why the

deviation is necessary to meet the needs of the child.[8]
See also General Statutes § 46b-84 (d).

## B

### Amount of Award

Under the schedule, the required support payment for two children declines from 35.99 percent when the combined net weekly income of the family is $310 to 15.89 percent when the combined net weekly income of the family is $4000. Regs., Conn. State Agencies § 46b-215a-2b (f). Consequently, the support payment for two children under the guidelines should presumptively not exceed 15.89 percent when the combined net weekly income of the family exceeds $4000, and, in most cases, should reflect less than that amount.

In the present case, the trial court first awarded the plaintiff $636 per week, the amount designated in the schedule when there are two children and the combined net weekly income of the family is $4000 per week. The court, however, also awarded the plaintiff 20 percent of the defendant's annual net cash bonus, which has varied in recent years from $489,449.50 to $1.368 million. See footnote 4 of this opinion. This translates into an increase in child support of approximately $1882 to $5261 per week, or three to eight times more than the base award. If the defendant's bonus reaches such levels in future years, the total child support payment

---

[8] We note that the relevant statutes and guidelines are consistent with federal regulations that require the states to adopt child support guidelines. For instance, 45 C.F.R. § 302.56 (a) provides: "Effective October 13, 1989, as a condition of approval of its [s]tate plan, the [s]tate shall establish one set of guidelines by law or by judicial or administrative action for setting and modifying child support award amounts within the [s]tate." There is no allowance in § 302.56 for states to depart from their adopted guidelines and deviation requirements in high income cases. See id. We also note that there would be potential constitutional concerns if this were not the case, implicating both the equal protection and due process rights of the party paying support.

will increase to approximately $130,000 to $306,000 per year, or approximately $2500 to $5900 per week. Although the guidelines permit the consideration of bonuses when calculating a family's combined weekly net income; Regs., Conn. State Agencies §§ 46b-215a-1 (11) (A) (iii) and 46b-215a-2b (c) (1) (B); an open-ended child support award of 20 percent, rather than 15.89 percent or less, of the defendant's variable bonus violates the guideline principles that a declining percentage of the combined net family income should be awarded as the income level rises and that the percentage of any future bonus allocated for child support should be "generally consistent"; id., § 46b-215a-2b (c) (1) (B) (ii); with the percentages established in the schedule in order to ensure consistency, uniformity and equity in the treatment of persons in such circumstances.[9] See

[9] The dissent states that, because the trial court "did not award any of the defendant's annual stock bonus as supplemental child support," it is not possible "to determine the exact percentage of total family net income that is ordered for child support." The dissent nonetheless inexplicably concludes that "if the defendant's annual stock bonus has any material value at all, then the supplemental child support ordered by the trial court would likely be *less than 15.89 percent* of total family net income . . . ." (Emphasis added.) This defies both logic and common sense. Without a valuation of the options and restricted stock, it is impossible to say what percentage of total family income will be paid as child support and one cannot possibly conclude, as does the dissenting opinion, that it would likely be less than 15.89 percent. What we do know is that it is unlikely that there was much value at all to the options and restricted stock.

Although the trial court did not explain why it did not allocate the defendant's future stock bonus as income when making the child support award, a review of the record provides several clues. We first note that the defendant's previously awarded stock bonuses, some of which would be paid out in future years, were subject to the court's equitable distribution order. Thus, they may not be counted because, to require payment of a portion of these bonuses when received by the defendant would result in "double-dipping." It is also important to note that, at the time of the dissolution order, the children were thirteen years old. The defendant received a bonus each January for work performed the preceding year. Accordingly, the first time the defendant would have been expected to receive a bonus following the divorce was in January, 2007. Exhibits filed at trial indicate that the defendant's stock bonuses in the past had consisted of options and restricted stock. The exhibits also indicate that the options awarded to the defendant

id., §§ 46b-215a-1 (6), 46b-215a-2b (c) (1) (B) and (f); see

after January, 2003, did not vest immediately but became exercisable at a rate of 25 percent per year on the anniversary date of the award. Similarly, restricted stock awarded to the defendant did not become vested and released until four years after the date of the award. The trial court made no factual findings regarding the division of the defendant's stock bonus between options and restricted stock. Other jurisdictions have concluded, however, that stock awards in divorce cases are not included in gross income for the purpose of making alimony and child support orders until they vest and may be exercised. See, e.g., *Murray* v. *Murray*, 128 Ohio App. 3d 662, 670, 716 N.E.2d 288 (App.), appeal denied, 85 Ohio St. 3d 1499, 710 N.E.2d 718 (1999); *Robinson* v. *Thiel*, 201 Ariz. 328, 333, 35 P.3d 89 (App. 2001); *In re Marriage of Cheriton*, 92 Cal. App. 4th 269, 288, 111 Cal. Rptr. 2d 755, review denied, 2001 Cal. LEXIS 8989 (2001). Mindful of this principle, we may deduce, on the basis of past stock bonuses awarded to the defendant, that any restricted stock awarded in January, 2007, would not become vested and exercisable until January, 2011, and that any options granted in January, 2007, would vest at a rate of 25 percent each year thereafter. Extrapolating from this data, any restricted stock bonus issued in January, 2007, would not be exercisable and considered income until the children were seventeen and one-half years old, and any restricted stock bonus awarded thereafter would not become exercisable and considered income until after the children reached the age of majority in July, 2011. In addition, only some of the stock options awarded to the defendant as part of his bonus would be exercisable and considered income before the children reached the age of majority. Furthermore, the stock options would be considered income only if the stock price increased above the option value during the succeeding four years. See *Finan* v. *Finan*, 100 Conn. App. 297, 307 n.4, 918 A.2d 910 (2007) (when market value of stock sinks below exercise price of option, option has no value or is "under water" [internal quotation marks omitted]), rev'd on other grounds, 287 Conn. 491, 949 A.2d 468 (2008). Consequently, it is understandable why the trial court made no factual findings regarding the defendant's future stock bonus awards and why it did not include such awards in its calculations of child support. The lack of information regarding how the defendant's future stock bonus would be divided between restricted stock and stock options, the lengthy time required in the past for both types of stock to vest and become exercisable, the uncertainty of the future value of the stock options and the fact that the children were only a few years short of the age of majority at the time of the divorce rendered the monetary value of any future stock bonus awarded to the defendant before the children reached the age of majority unknowable and, to the extent that it could be known, most likely insignificant in comparison to the defendant's net cash bonus award. Accordingly, the trial court likely concluded that the defendant's annual stock bonus award would have had little effect on the defendant's gross income for the five remaining years before the children reached the age of majority.

*Unkelbach* v. *McNary*, supra, 244 Conn. 357–58 ("The percentage allocations contained in the guidelines aim to reflect the average proportions of income spent on children in households of various income and family sizes . . . . The result is that the guidelines incorporate an allocation of resources between parents and children that the legislature has decided is the appropriate allocation. Consequently, our interpretation of the guidelines must seek to *preserve* this allocation." [Citation omitted; emphasis added.]). An increase of this magnitude over the minimum award at the high end of the income spectrum, as established in the schedule, also raises serious questions regarding the trial court's rationale and appears to be inconsistent with the statutory mandate to consider the actual needs of the children. See General Statutes § 46b-84 (d).

C

Application of Deviation Criteria

The trial court explained its reasons for deviating from the guidelines as the "[defendant's] substantial assets . . . [and] superior earning capacity, the extraordinary disparity in parental income and the significant and essential needs of the [plaintiff] including, but not limited to, the need to provide a home for the children." As if to downplay the significance of the deviation, the court further noted that it had not considered the defendant's yearly noncash compensation, consisting of stock options and restricted stock in the amount of $530,000 for the year 2005. The court provided no other reasons, however, for its decision. We conclude that, although the court ostensibly applied the deviation criteria in awarding the plaintiff 20 percent, rather than 15.89 percent or less, of the defendant's annual net cash bonus, it did not understand and apply the criteria correctly, thus failing to preserve the allocation of resources between parents and children author-

ized by the legislature under the relevant statutes and established by the commission. See General Statutes §§ 46b-215a and 46b-215b.

The deviation criteria are narrowly defined and require the court to make a finding on the record as to why the guidelines are inequitable or inappropriate. In the present case, the court did not make such a finding. The court also misconstrued the deviation criteria. The court's first reason for the large, open-ended award of bonus income was the defendant's "substantial assets" and "superior earning capacity . . . ." This rationale appears to have been drawn from the first criteria, which permits the court to consider "[o]ther financial resources available to a parent [such as substantial assets and superior earning capacity] . . . that are not included in the definition of net income, but could be used by the parent for the benefit of the child or for meeting the needs of the parent." Regs., Conn. State Agencies § 46b-215a-3 (b) (1); see also id., § 46b-215a-3 (b) (1) (A) and (B). The defendant's annual net cash bonus, however, is not another "available" financial resource under the first criteria because bonuses are included in the definition of net income. Id., § 46b-215a-1 (11) (A) (iii) and (17). Thus, the court was not permitted to consider the defendant's "substantial assets" and "superior earning capacity" to justify the additional child support award derived from his annual bonus. Furthermore, even if bonuses were not included in the guidelines' definition of "net income" and could have been considered another "available" financial resource, the court did not explain how an increase in the level of support of 15.89 percent or more of the defendant's bonus would have benefited the children or met the needs of the plaintiff, especially in light of yearly changes in bonus income unrelated to family circumstances. Indeed, it appears that the parties placed much of the defendant's extraordinary income during their

marriage into savings and investment accounts that had little effect on their daily standard of living. See Child Support and Arrearage Guidelines (2005), preamble, § (e) (4) (A), p. iv (higher income families devote more income to savings, other nonconsumption expenditures and discretionary adult goods); *Ford* v. *Ford*, supra, 600 A.2d 30 (higher income families spend less and less on " 'needs' " and put more and more into savings or investments). Finally, the plaintiff's share of the property distribution award was considerably greater than the defendant's, particularly with respect to cash and other readily accessible liquid assets. Thus, to the extent that both parties were left with substantial assets after the property division, the defendant's assets could not have provided a sufficient ground for the court's departure from the guidelines.

The court next referred to "the extraordinary disparity in parental income . . . ." The court apparently was relying on the sixth criteria, in which income disparity is one of several "[s]pecial circumstances that permit a departure from the guidelines. Regs., Conn. State Agencies § 46b-215a-3 (b) (6). Income disparity may be considered, however, only when the *custodial parent* has the higher income and deviation from the presumptive support amount "would enhance the lower income [noncustodial] parent's ability to foster a relationship with the child . . . ." Id., § 46b-215a-3 (b) (6) (B) (i). This consideration is unambiguously intended to protect the noncustodial parent in circumstances where the income of the custodial parent far exceeds the income of the parent obligated to pay child support, which is not the case here. Thus, the court's consideration of income disparity under the sixth deviation criteria was improper.

The court's third and final reason for departing from the guidelines was the "significant and essential needs of the [plaintiff] including, but not limited to, the need

to provide a home for the children." An award made to satisfy the "essential needs of the [plaintiff]" is improper, however, because child support awards, by definition, must benefit the children or foster their relationship to their parents. See General Statutes § 46b-84 (d). Any consideration of the *plaintiff's* needs thus must be restricted to the fashioning of an alimony award under General Statutes § 46b-82[10] and cannot justify a deviation from the guidelines. In addition, the court made no specific finding regarding how an open-ended bonus award would foster the needs of the children, nor did the court explain why the plaintiff, to whom it had awarded significant assets in the form of a mortgage free house, approximately $7 million in liquid assets and 20 percent of the defendant's net cash bonus as alimony, required additional funds "to provide a home for the children."[11] The court also apparently failed to

---

[10] General Statutes § 46b-82 (a) provides in relevant part: "In determining whether alimony shall be awarded, and the duration and amount of the award, the court shall . . . consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to section 46b-81, and, in the case of a parent to whom the custody of minor children has been awarded, the desirability of such parent's securing employment."

[11] The trial court's award in the present case, in addition to lacking any explicit justification based on the reasonable needs of the children, also ignored the statutory mandate that, subsequent to a dissolution, "the parents of . . . minor child[ren] of the marriage, shall maintain the child[ren] *according to their respective abilities* . . . ." (Emphasis added.) General Statutes § 46b-84 (a). In this respect, the preamble to the guidelines provides in relevant part: "[T]he commission emphasizes that it is the obligation of both parents to contribute to the support of their children to the extent of their ability . . . . In addition to spending the designated support payments on the child, the parent receiving such payments remains obligated to expend a portion of his or her own personal income on the child's behalf." Child Support and Arrearage Guidelines (2005), preamble, § (e) (1), p. iv. In this case, however, the trial court apparently gave no consideration to the substantial assets and investment income of the plaintiff or the substantial alimony award that the plaintiff stands to receive in the form of her 20 percent share of the defendant's annual bonus in fashioning the child support obligations of the defendant. Thus, the court must have expected that the

consider that, because the defendant was awarded physical custody of the children approximately 40 percent of the time, the plaintiff's needs with respect to providing a home for the children would be correspondingly diminished.

In addition, although the court stated that it had considered all of the statutory criteria, it failed to provide any explicit justification for the award of bonus income that was related to the financial *or* nonfinancial needs or characteristics of the children under General Statutes § 46b-84 (d), which requires consideration of the child's "age, health, station, occupation, educational status and expectation, amount and sources of income, vocational skills, employability, estate and needs . . . ." In fact, there is no evidence that the court considered *anything* other than the defendant's income and earning capacity in making the child support award. Thus, absent a finding as to how the additional funds would be used for the benefit of the children and how the award was related to the factors identified in § 46b-84 (d), we conclude that the court exceeded its legitimate discretion. Indeed, we are at a loss to explain how approximately $360 to $840 every single day of the year, which is the amount the plaintiff would receive in income based child support if the defendant earned an annual net cash bonus of $490,000 to $1.368 million, can seriously be justified, especially when the costs of the children's education, health care and extracurricular activities will be paid solely by the defendant and not by the plaintiff out of the child support award.

The dissent argues that the focus of the plurality is on the "physical needs of the children" and that this

plaintiff would spend nothing on the support of the children or that she would spend a substantially similar amount as the defendant. In either case, the award is not only inconsistent with the relevant statutes and guidelines, but totally ignores the income shares model, which serves as the basis for the guidelines.

opinion "ignores the 'new wave' of cases that recognizes the significance of the standard of living of children of affluent parents." We disagree. We recognize that children in high income families are accustomed to a more affluent lifestyle that should be maintained to the extent reasonably possible. Indeed, § 46b-84 mandates that the court consider factors such as the occupation, station, earning capacity and amount and sources of income of the parents as well as the age, health, station, educational status, expectation, estate and needs of the child. Section 46b-215b (a), however, provides that the guideline principles must be considered in "all determinations of child support amounts . . . ." Accordingly, the trial court should not have *unfettered* discretion in high income cases to make lavish child support awards that appear to be unrelated both to the needs of the children, even after considering their station, and to the principles articulated in the guidelines, including the principle that an award based on bonus income should be generally consistent with the schedule.

The dissent overlooks the trial court's failure to provide any justification relating to the characteristics and needs of the children when the court granted the award of bonus income. The court made no findings regarding how much of the family's disposable income before the divorce had been spent on the children to justify such an award and apparently did not consider that it already had (1) granted the defendant physical custody and responsibility for the children 40 percent of the time, (2) awarded the plaintiff the mortgage free $2.55 million marital home and more than $8 million in cash and investment accounts, and (3) ordered the defendant to pay all of the children's private school tuition, medical and dental insurance, unreimbursed medical, dental, orthodontia, optical and psychological expenses and all summer camp and extracurricular activity expenses. Thus, it is difficult to understand why the court made

such a high net cash bonus award absent any findings or evidence in the record that it was needed by, or would be spent on, the children.

The effect of unrestrained child support awards in high income cases is a potential windfall that transfers *wealth* from one spouse to another or from one spouse to the children under the guise of child support. In the present case, the award of 20 percent of the defendant's indeterminate annual bonus without any justification relating to the characteristics or needs of the children closely resembles the "disguise[d] alimony" this court disapproved of in *Brown* v. *Brown,* 190 Conn. 345, 349, 460 A.2d 1287 (1983).

In *Brown,* the plaintiff's weekly household expenses amounted to $340.23. Id., 348. The trial court nonetheless ordered the defendant to pay $325 per week in child support, in addition to maintaining medical insurance and paying for 50 percent of the child's unreimbursed medical expenses. Id. On appeal, we concluded that the child support award was improper because it was "grossly disproportionate to the child's needs." Id., 349. Recognizing that "[c]hild support orders must be based on the statutory criteria enumerated in . . . § 46b-84 of which the most important is the needs of the child," we held that "support award[s] may not be used to disguise alimony awards to the custodial parent." Id.; see also *Loughlin* v. *Loughlin,* 280 Conn. 632, 655–56, 910 A.2d 963 (2006) (alimony and child support serve distinct purposes and one must not be used to disguise improper increased payment of other). Other courts have similarly noted that "guidelines and percentages used without limitation are unrealistic and unfair when both parents have substantial incomes. . . . When a parent has an ability to pay a large amount of support, the determination of a child's needs can be generous, but all any parent should be required to pay, regardless of his or her ability, is a fair share of the

amount *actually necessary* to maintain the child in a reasonable standard of living. Court-ordered support that is more than reasonably needed for the child becomes, in fact, [tax free] alimony." (Citations omitted; emphasis added.) *Kalter* v. *Kalter*, 155 Mich. App. 99, 104, 399 N.W.2d 455 (1986), leave to appeal denied, 428 Mich. 862 (1987); *Rodriguez* v. *Rodriguez*, 834 S.W.2d 369, 372 (Tex. App. 1992) ("[a]n award of child support above the guidelines without regard to needs and solely because the obligor has great income would amount to de facto alimony"), rev'd on other grounds, 860 S.W.2d 414 (Tex. 1993); accord *Williams* v. *Williams*, 261 N.C. 48, 58, 134 S.E.2d 227 (1964) ("[i]t is never the purpose of a support order to divide the [noncustodial parent's] wealth or to distribute his estate"). Consequently, the trial court's discretion must be informed by careful consideration of guideline principles to lessen the risk of improper child support awards in high income cases.

We therefore conclude that, when a family's combined net weekly income exceeds $4000, the court should treat the percentage set forth in the schedule at the highest income level as the presumptive ceiling on the child support obligation, subject to rebuttal by application of the deviation criteria enumerated in the guidelines, as well as the statutory factors described in § 46b-84 (d). Additionally, when there is a proven, routine consistency in annual bonus income, as when a bonus is based on an established percentage of a party's steady income, an additional award of child support that represents a percentage of the net cash bonus also may be appropriate if justified by the needs of the child. When there is a history of wildly fluctuating bonuses, however, or a reasonable expectation that future bonuses will vary substantially, as in the present case, an award based on a fixed percentage of the net cash bonus is impermissible *unless* it can be linked to the child's characteristics and demonstrated needs.

In determining whether to supplement the basic child support obligation with bonus income, the court also must consider the property division and custody schedule as well as any additional support obligations imposed on the noncustodial parent for education, health care, recreation, insurance and other matters. In the present case, the court entered separate orders requiring the defendant to pay all of the children's medical and health related expenses as well as all expenses relating to the children's "summer day camp and extracurricular activities," which presumably would cover many of the luxuries to which children of affluent families are accustomed and would expect to be maintained following a divorce. When not covered by separate orders, however, such expenses are not infinite, and thus are not likely to represent a uniform percentage of a defendant's variable bonus income, regardless of the income level in any given year. See *Marriage of Edwards*, 99 Wash. 2d 913, 918–19, 665 P.2d 883 (1983) ("[A]n open-ended percentage of income support award may not necessarily relate to the child's support needs. Thus, a limitation on the concept is needed. In fashioning such awards, the trial judge should determine a maximum amount of child support that would be reasonable and needed in the future and set that amount as a ceiling above which the support payments cannot rise."); see also *Harmon* v. *Harmon*, 173 App. Div. 2d 98, 111, 578 N.Y.S.2d 897 (1992) ("[T]o apply blindly the statutory formula to the parties' aggregate income over [the maximum provided for in the guidelines] without any express findings or record evidence of the child's actual needs would constitute both an abdication of the judicial responsibility and a trespass upon the right of parents to make [lifestyle] choices for their children. Although entitled to support in accordance with the preseparation standard, a child is not a partner in the marital relationship, entitled to a 'piece of the action.' ").

We emphasize that trial courts remain free to exercise their discretion in determining the appropriate child support award in light of the particular circumstances of each case. As one court has stated: "When the [parties'] combined adjusted gross income exceeds the uppermost limit of the . . . schedule, the amount of child support awarded must rationally relate to the reasonable and necessary needs of the child, taking into account the lifestyle to which the child was accustomed and the standard of living the child enjoyed before the divorce, *and* must reasonably relate to the obligor's ability to pay for those needs. . . . To avoid a finding of an abuse of discretion on appeal, a trial court's judgment of child support must satisfy both prongs." (Emphasis in original; internal quotation marks omitted.) *Burgett* v. *Burgett*, 995 So. 2d 907, 913 (Ala. App. 2008). Although we do not specifically endorse this approach as the standard to be applied in Connecticut, it has an intuitive appeal and is consistent with § 46b-84 (d) because it suggests that the total child support obligation must be capped at a sum bearing some rational relation to the "estate and needs of the child."

Relying on *Battersby* v. *Battersby*, 218 Conn. 467, 473, 590 A.2d 427 (1991), and the preamble to the guidelines, the plaintiff argues that the trial court did not abuse its discretion in awarding 20 percent of the defendant's net cash bonus as child support. She argues that the court's discretion is limited in high income cases only by the factors set forth in § 46b-84, and not by the guidelines, and that the award was justified in the present case as necessary to avoid a dramatic change in the children's standard of living that might result in their emotional and psychological harm. A thorough review of both *Battersby* and the preamble to the guidelines, however, indicates otherwise. Moreover, the court's other orders ensured that there would be little or no change in the children's standard of living.

We first note that the plaintiff improperly conflates the guidelines and the schedule contained therein. To the extent that the parties' combined net weekly income exceeds $4000, the upper limit of the schedule, we agree with the plaintiff that the schedule cannot, and does not, apply, except insofar as the guidelines mandate a minimum child support payment. This does not mean, however, that the guideline principles that *inform* the schedule, including equity, consistency and uniformity in the treatment of persons in similar circumstances; Child Support and Arrearage Guidelines (2005), preamble, § (c) (1) and (2), p. ii.; do not continue to apply merely because the parties' income exceeds the schedule's upper limit. As previously discussed, § 46b-215b requires that the guidelines "*shall* be considered in *all* determinations of child support amounts"; (emphasis added); which, according to the preamble, have been established in the schedule on the basis of the income shares model and reflect the principle that spending on children declines as a proportion of family income as income levels rise. Child Support and Arrearage Guidelines (2005), preamble, § (d), pp. ii–iii. Accordingly, the guidelines cannot be ignored when the combined net family income exceeds the upper limit of the schedule, but remain applicable to all determinations of child support.

The plaintiff's reliance on *Battersby* is also misguided because she takes its language out of context. In that case, the plaintiff husband's weekly income exceeded the highest income level in the schedule. *Battersby* v. *Battersby*, supra, 218 Conn. 468. The defendant wife, who was the custodial parent for the couple's two minor children, appealed from the trial court's *downward* departure from the schedule, arguing that the top percentage in the schedule, which at the time was 44 percent, should be applied to the plaintiff's higher income. Id., 469, 472–73. We explained, however, that the trial

court properly had declined to employ the maximum percentage because "applying the [g]uidelines [schedule] to incomes in excess of [the maximum] would be inequitable because the statistical basis for the [schedule] loses its validity as the disposable income of the family increases; that is, the proportion of household income spent on children declines as household income increases." Id., 473. We therefore endorsed the trial court's rationale, explaining that, "while a family earning [the maximum combined net weekly income] may spend 44 percent of its income supporting two children, a family earning [a considerably greater weekly income than the maximum established in the schedule] ordinarily spends a lower percentage. Since the purpose of a child support order is to provide for the care and well-being of minor children, and *not to equalize the available income of divorced parents*, the trial court had the authority to reject the defendant's suggested extrapolation of the [g]uidelines' percentage as inappropriate and inequitable in the circumstances before it." (Emphasis added.) Id.

We nonetheless did not endorse a completely ad hoc approach to higher income support awards, but noted with approval that the trial court had "considered the [g]uidelines, found the [schedule] inapplicable for arriving at a presumptive support amount, and considered the statutory criteria *and other [g]uideline factors* in arriving at its decision." (Emphasis added.) Id., 472. Accordingly, *Battersby* implicitly *bars* the use of percentages greater than the highest provided for in the schedule when determining appropriate child support obligations in higher income cases and instructs, first, that the plaintiff in the present case is incorrect in concluding that the guidelines are inapplicable to high income cases, and, second, that the application of a percentage *greater* than the maximum provided in the schedule is highly questionable and must at least be

justified by "other [g]uideline factors . . . ." Id. In short, the plaintiff's argument misses the crucial point that *Battersby* actually *contradicts* her view that the award in the present case was proper.

Our reasoning in *Battersby* was recently applied by the Appellate Court in *Gentile* v. *Carneiro*, supra, 107 Conn. App. 630, which held, inter alia, that the trial court improperly had ordered the defendant "to pay an excessive percentage of his future commissions as supplemental support." Id., 644. In *Gentile*, the court first explained that a supplemental order mandating a payment based on a percentage of future lump sum income must be "generally consistent with the guidelines' schedule"; Child Support Arrearage Guidelines (2005), preamble, § (g) (6), p. ix; and that this occurs "when [the payment] is of a percentage that, as a whole, is in harmony with the schedule"; *Gentile* v. *Carneiro*, supra, 644; and "account[s] for a parent's declining percentage support obligation that accompanies an increase in income." Id., 648. Recognizing that such future income may cause the obligor's income to exceed the range of the schedule, the court established a general principle based on the economic policy underlying the guidelines that "a supplemental support order must account for the schedule's inverse relationship between a parent's net income and his weekly support obligation, while also accounting for those instances in which a future payment of unknown amount exceeds the range of the schedule." Id., 649. The Appellate Court found that the supplemental award in *Gentile* "excessively burdened the defendant . . . [because] [n]o matter what the actual value of the defendant's future commission, he will always be obligated to pay as support a higher percentage than what the schedule mandates." Id., 650. Thus, the case was remanded so that the trial court could "craft a supplemental order that requires the defendant to pay a declining percentage of supple-

mental support as the future lump sum payment increases while also accounting for those instances in which the future lump sum payment exceeds the range of the schedule. The percentages in the court's order should be within the range utilized by the schedule." Id. The rationale articulated by the court in *Gentile,* which is no more than a restatement of the reasoning expressed in the guidelines, is applicable even in cases in which a family's net income exceeds the maximum established in the schedule. We therefore approve of the analysis in *Battersby* and *Gentile* and conclude that the guidelines' requirement of "general consisten[cy]" must be applied to all child support awards. Child Support and Arrearage Guidelines (2005), preamble, § (g) (6), p. ix.

With respect to the plaintiff's concern that the children may suffer emotional harm because of a change in their standard of living, we reiterate that the court awarded the plaintiff $10.65 million, of which $8.1 million was in cash and investment accounts, the parties' mortgage free $2.55 million marital home and alimony in the amount of $1215 per week plus 20 percent of the defendant's annual net cash bonus and 20 percent of any future tax refund the defendant may receive. Additionally, the defendant was ordered to provide comprehensive medical insurance benefits for the plaintiff at his expense for the maximum period allowed by law and to obtain a life insurance policy in favor of the plaintiff in the amount of $2 million. He also was ordered to pay 100 percent of the children's private school tuition until they complete high school and "all work related day care expenses and summer day camp and extracurricular activities," and to "maintain and pay for all medical and dental insurance for the benefit of the children . . . [and] 100 percent of all unreimbursed medical, dental, orthodontia, optical and psychological expenses." The court also left the door open for a future

order regarding payment of the children's college expenses. Accordingly, it does not appear that the court's financial orders will cause the children to suffer a significant change in their standard of living, and, as noted elsewhere in this opinion, the award would not survive review even if the only test applied was based on the factors set forth in § 46b-84 (d).

As we have stated previously, the guidelines do not cease to apply and permit trial courts unlimited discretion in setting child support awards merely because the income of a particular family exceeds some talismanic number on a chart. Neither this court, nor the trial court, is at liberty, where a particular family enjoys a relatively high income, to disregard the significant progress that has been made in standardizing child support awards since the advent of the guidelines. See 42 U.S.C. § 667 (b) (2) (1988). Removing consideration of the guidelines from child support decisions deprives high income families of the fairness and consistency the guidelines require and leaves the trial and appellate courts adrift, unanchored to the core principles that guide support awards in cases falling *within* the guidelines' schedule. We therefore conclude that the trial court abused its discretion in awarding the plaintiff 20 percent of the defendant's annual net cash bonus in child support.

In his concurrence, Justice Schaller claims that the plurality incorrectly elevates the child support guidelines to "controlling authority" in cases in which the parties' combined net weekly income exceeds the upper limit of the schedule, thus infringing on trial courts' broad discretion to determine child support awards in such cases on the basis of statutory authority alone, "unfettered" by the strict principles of the guidelines except as a factor to be "considered." We disagree. The concurrence misconstrues our decision, which does not rely solely on the guidelines, but takes significant

account of the applicable statutory authority on which the guidelines are based. The concurrence also fails to recognize that, in establishing a commission to promulgate and regularly update child support guidelines, subject to legislative approval, the legislature *intended* to limit the courts' traditionally broad judicial discretion in child support matters.

Knowledge of the guidelines' legislative history is essential in understanding how and why they limit judicial discretion, a subject that we previously addressed in *Favrow* v. *Vargas*, 222 Conn. 699, 707–708, 610 A.2d 1267 (1992), but review again here. The legislature initially considered establishing guidelines to assist courts in dissolution proceedings in 1984, when it enacted Special Acts 1984, No. 84-74. Id., 707. The special act had two goals, the first being to establish pilot programs in two judicial districts for the mediation and conciliation of disputes arising in marriage dissolution proceedings, and the second being to appoint an inter-agency commission to develop *family* support guidelines for use by family relations counselors in the selected districts. Id.

The guidelines developed at that time were not intended to limit judicial discretion in entering family support orders, but to be flexible and nondirective. Id., 708. To this end, the commission specifically recommended that they be used by family relations counselors as part of the mediation process. Id., 710. In an addendum to the commission's report, however, the mediators appointed under the special act "recommended that the guidelines be formally incorporated as guidelines to be considered by judges in the adjudication of family support matters." (Internal quotation marks omitted.) Id.

In 1985, the legislature revisited the issue and enacted Public Acts 1985, No. 85-548 (P.A. 85-548), entitled "An

Act Implementing the Federal Child Support Enforcement Amendments of 1984." Id. Section 8 of the act established a second commission "to develop guidelines, not later than January 1, 1987, for *child support* award amounts within the state. Such guidelines shall be available but not binding upon judges and other officials who have the power to determine child support awards." (Emphasis added; internal quotation marks omitted.) Id., 710–11. Thus, although P.A. 85-548 specified that the new guidelines would address child support awards and expanded their use from family relations counselors to the courts, the act also explained, consistent with past practice, that the guidelines were not intended to be binding. Id., 711.

In 1989, the legislature considered the issue once again and enacted Public Acts 1989, No. 89-203, entitled, "An Act Concerning Child Support Guidelines." Id. Section 1 of the act established a third commission "to review the child support guidelines promulgated pursuant to [§] 8 of [P.A.] 85-548 . . . to establish criteria for the establishment of guidelines to ensure the appropriateness of child support awards and . . . to issue updated guidelines not later than January 1, 1991 and every four years thereafter." (Internal quotation marks omitted.) Id., 711–12. Section 1 of the act is now codified as § 46b-215a and §§ 2 and 3 are now codified as § 46b-215b. Id., 712.

As we noted in *Favrow*, § 46b-215b (a) made four significant changes in the child support guidelines that had the effect of "*displac[ing]* the flexible and nondirective approach" previously taken. (Emphasis added.) Id. These changes included requirements that (1) the guidelines " 'shall be considered in *all* determinations of child support amounts within the state' "; (emphasis added) id.; (2) " 'there shall be a rebuttable presumption that the amount of such awards which resulted from the application of such guidelines is the amount of support

to be ordered' "; id.; (3) in order " 'to rebut the presumption in such case,' " the court or magistrate must make a " 'specific finding on the record that the application of the guidelines would be inequitable or inappropriate in a particular case' "; id., 712–13; and (4) such a specific finding must be " 'determined under criteria established by the commission.' " Id., 713. The commission subsequently promulgated new guidelines in response to the statutory mandate, describing the deviation criteria in more detail and expanding them to ensure that child support orders would be in the best interests of the child and financially equitable to the parties. Id.

In summarizing this history, we observed in *Favrow* that "the guidelines evolved from an experimental, intentionally nondirective and flexible approach to the imposition of standards that are presumptively binding on the court or magistrate, from which deviations would be permitted only in accordance with specific findings related to specific criteria established by the commission. Thus, in general, the 1989 legislation and the ensuing work of the commission substantially circumscribes the traditionally broad judicial discretion of the court in matters of child support." Id., 715.

In light of the foregoing history, we no longer may view trial courts as having broad discretion to make child support awards in high income cases, "unfettered" by guideline principles that, according to Justice Schaller's concurrence, need only be "considered." The legislature in very clear terms delegated authority to the commission to establish the guidelines for the purpose of ensuring that child support awards are appropriate; General Statutes § 46b-215a; and further directed that the guidelines "*shall* be considered in *all* determinations of child support amounts . . . ." (Emphasis added.) General Statutes § 46b-215b (a). The statutory mandate to consider the guidelines cannot have a different meaning in the context of a high income family merely

because the parties' joint income exceeds the upper limit of the schedule. The guidelines are not restricted to the schedule alone, but also include "the *rules, principles . . . and worksheet*" contained therein. (Emphasis added.) Regs., Conn. State Agencies § 46b-215a-1 (5). Moreover, the guidelines define "[c]hild support award" as, inter alia, "the entire payment obligation of the noncustodial parent, *as determined under the . . . guidelines . . . .*" (Emphasis added.) Id., § 46b-215a-1 (6). Neither provision allows for an exception to be made in high income cases.

Furthermore, to construe the word consider differently in high income cases would not make sense when the purpose of the guidelines is to limit judicial discretion in child support matters "[t]o make awards more equitable by ensuring the consistent treatment of persons in similar circumstances." Child Support and Arrearage Guidelines (2005), preamble, § (c) (2), p. ii. In its final report issued in January, 1991, the commission that promulgated the latest guidelines under the mandate of § 46b-215b noted that the guidelines "have been working quite well . . . . The order establishment process has been expedited . . . and . . . orders of support are generally more consistent. Generally, there is less litigation, and much more thought is being given to the reasons for deviation from the guidelines." (Internal quotation marks omitted.) *Favrow* v. *Vargas*, supra, 222 Conn. 713. To permit courts unlimited discretion to make awards in high income cases would be contrary to the directives contained in the relevant statutes and guidelines, to the legislature's intent to circumscribe the authority of the courts in child support matters and to the legislature's stated goal of achieving equity and consistency in child support awards.

In his concurrence, Justice Schaller also claims that applying the guidelines in high income cases constitutes

an inappropriate expansion of regulatory authority. We disagree. The guidelines follow the statutory mandates closely and remain subject to legislative control through the statutory requirement that they be updated every four years and submitted to the standing legislative regulation review committee for approval and adoption. See General Statutes § 46b-215c.

Insofar as Justice Schaller relies on *Battersby*, he takes the *Battersby* language out of context. Although the court in *Battersby* noted that the guidelines' schedule contained no provision for extrapolating the percentages and award amounts therein to higher income levels, it also observed that several other factors in the guidelines were relevant in determining the support amount. *Battersby* v. *Battersby*, supra, 218 Conn. 471–72. The court thus concluded that, although the trial court had found the schedule inapplicable, it properly had considered "other [g]uideline factors" as well as the statutory criteria in arriving at its decision. Id., 472. Furthermore, *Favrow* v. *Vargas*, supra, 222 Conn. 699, was decided after *Battersby* and, although the issue in *Favrow* did not involve a high income family, the *Favrow* court clarified that the guidelines were intended to "substantially [circumscribe] the traditionally broad judicial discretion of the court in matters of child support." Id., 715. Finally, when the *Favrow* case returned to this court in 1994, we specifically referred to the authority of § (a) (1) of the guidelines, which provides that "[t]he . . . guidelines shall be considered in *all* determinations of child support amounts within the state" and that "the guidelines consist of the Schedule of Basic Child Support Obligations as well as *the principles and procedures set forth [therein].*" (Emphasis added; internal quotation marks omitted.) *Favrow* v. *Vargas*, 231 Conn. 1, 27, 647 A.2d 731 (1994).

Justice Schaller's concurring opinion maintains that, having elevated the guidelines improperly to governing

authority, the plurality consigns the relevant statutes to a minor role in its analysis. We do not agree. The governing statutes, principally §§ 46b-84 (d), 46b-215a and 46b-215b, have been addressed at length throughout our analysis and we regard them as the foundation for the guidelines, which merely satisfy the statutory mandate of assisting the courts in making appropriate child support awards. Accordingly, this assertion has no merit.

## II

### TAX REFUND AWARD

The defendant also challenges the trial court's order allocating 20 percent of any undetermined future tax refund as additional alimony and 20 percent as additional child support. The defendant specifically claims that the order is unworkable, subject to manipulation, will hinder his tax planning and will lead to unintended results. He describes various hypothetical scenarios that could result in such a refund, and, therefore, additional child support and alimony payments to the plaintiff that were not intended by the court and that could lead to hostile court proceedings between the parties. The plaintiff responds that the order was not improper because it was necessary to discourage the defendant from manipulating his tax withholding amounts to the plaintiff's disadvantage, and adds that the defendant's claim is purely speculative and without any legal basis. We conclude that the order was improper only with respect to the payment of additional child support.

The following additional facts and procedural history are relevant to our resolution of this claim. The trial court ordered the defendant to pay to the plaintiff 20 percent of any state or federal tax refund that he receives as child support for any year in which child support is owed, and 20 percent of any state and federal tax refund that he receives as alimony for any year in

which alimony is owed. In response to the plaintiff's motion seeking further articulation of this order, the trial court explained that "the plaintiff shall share in 20 percent of any tax refund awarded the defendant relating to over withholding on his base salary or cash bonus. The intention of the court is to discourage over withholding of taxes by the defendant in an attempt to reduce his support payments." The defendant did not seek further clarification or articulation of the order.

We conclude that, insofar as the order allocated 20 percent of the defendant's tax refund as alimony, it was not improper. The purpose of the order was to discourage the over withholding of taxes by the defendant to reduce his support payments and applies only if the defendant receives a tax refund for withholding more taxes than necessary from his base salary or cash bonus. We agree with the defendant that implementation of the order may prove cumbersome and that the same result of discouraging tax manipulation could have been achieved by a simple, direct order that the defendant not over withhold on his taxes or by an order that the defendant pay a smaller, capped percentage of his gross, or pretax, cash bonus as supplemental alimony, thereby eliminating the practical difficulties inherent in the current order. Nevertheless, we cannot say that the trial court abused its broad discretion in entering such an order. We further conclude, however, that insofar as the order pertains to the defendant's child support obligation, it is inconsistent with the guidelines and must be reversed for all of the reasons described in part I of this opinion regarding the calculation of child support.

## III

## DIVISION OF ASSETS

The defendant's third and final claim is that the trial court improperly divided the parties' marital assets. The defendant specifically claims that, although the court

awarded the plaintiff assets valued at $10,650,719, or approximately 60 percent of the marital estate, and the defendant assets valued at $7,099,879, or approximately 40 percent of the marital estate, he will be required to pay income tax at ordinary income rates on most of the assets he received, whereas the plaintiff will pay income taxes for the assets she received at more favorable rates under applicable state and federal law. The defendant thus contends that the actual value of the assets he received is dramatically lower than the value indicated by the court, and, consequently, the disparity between the value of the assets awarded to the parties is much larger than the 60 to 40 percent allocation that the trial court intended. The plaintiff responds that the court did not intend to award 60 percent of the marital estate to the plaintiff and 40 percent to the defendant. Accordingly, it cannot have erred by ignoring tax effects that allegedly would frustrate an unintended outcome. We agree with the plaintiff.

The following relevant facts and procedural history are necessary to our resolution of this claim. At the time of the dissolution, the court awarded the plaintiff assets valued at $10,650,719 and the defendant assets valued at $7,099,879. In its memorandum of decision, the court stated that it had made the award after considering all of the statutory criteria set forth in General Statutes § 46b-66a[12] and General Statutes § 46b-81,[13]

[12] General Statutes § 46b-66a provides: "(a) At the time of entering a decree annulling or dissolving a marriage or for legal separation pursuant to a complaint under section 46b-45, the Superior Court may order the husband or wife to convey title to real property to the other party or to a third person.

"(b) When any party is found to have violated an order of the court entered under subsection (a) of this section, the court may, by decree, pass title to the real property to either party or to a third person, without any act by either party, when in the judgment of the court it is the proper action to take.

"(c) When the decree is recorded on the land records in the town where the real property is situated, it shall effect the transfer of the title of such property as if it were a deed of the party or parties."

[13] General Statutes § 46b-81 provides: "(a) At the time of entering a decree annulling or dissolving a marriage or for legal separation pursuant to a

together with the applicable case law and the evidence presented by the parties. The defendant subsequently filed a motion for articulation asking the court to further explain: "Was it the court's intention to divide the marital estate proportionately by distributing approximately 60 [percent] of its value to [the] plaintiff and 40 [percent] of its value to [the] defendant?" The court granted the defendant's motion and clarified its judgment as follows: "The court did not ascribe any particular percentages of the marital estate in its June 12, 2006 memorandum of decision . . . ."

In *Powers* v. *Powers*, 186 Conn. 8, 10, 438 A.2d 846 (1982), we observed that a trial court may consider the tax consequences of its financial orders in dissolution actions, but did not address whether a court is *required* to consider this factor. The Appellate Court, however, has repeatedly stated that "neither statute nor case law requires that a trial court consider the federal tax implications of the financial awards." (Internal quotation

complaint under section 46b-45, the Superior Court may assign to either the husband or wife all or any part of the estate of the other. The court may pass title to real property to either party or to a third person or may order the sale of such real property, without any act by either the husband or the wife, when in the judgment of the court it is the proper mode to carry the decree into effect.

"(b) A conveyance made pursuant to the decree shall vest title in the purchaser, and shall bind all persons entitled to life estates and remainder interests in the same manner as a sale ordered by the court pursuant to the provisions of section 52-500. When the decree is recorded on the land records in the town where the real property is situated, it shall effect the transfer of the title of such real property as if it were a deed of the party or parties.

"(c) In fixing the nature and value of the property, if any, to be assigned, the court, after hearing the witnesses, if any, of each party, except as provided in subsection (a) of section 46b-51, shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates."

marks omitted.) *Rolla* v. *Rolla*, 48 Conn. App. 732, 747, 712 A.2d 440, cert. denied, 245 Conn. 921, 717 A.2d 237 (1998); see also *Hawkins* v. *Hawkins*, 11 Conn. App. 195, 197–98, 526 A.2d 872 (1987); *Seaver* v. *Seaver*, 10 Conn. App. 134, 521 A.2d 1053 (1987).

Mindful of this principle, we conclude that the defendant's claim has no merit. The court expressly articulated that it had not ascribed any particular percentage of the assets to either party. Its failure to consider the tax implications of the property division thus had no effect on its alleged intent to distribute the assets proportionately between the plaintiff and the defendant because it had no such intent. Moreover, in light of consistent holdings that a trial court is permitted, but not required, to consider the tax implications of its orders, the court's apparent failure to do so was not improper. Finally, with respect to its underlying rationale for the division of assets, the court stated in its memorandum of decision that it had considered all of the applicable case law, evidence and statutory criteria, including §§ 46b-66a and 46b-81. Under § 46b-81 (c), the court is presumed to have considered "the length of the marriage, the causes for the . . . dissolution of the marriage . . . the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income . . . [as well as] the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates."

As we have previously stated, "this court will not disturb trial court orders unless the trial court has abused its legal discretion or its findings have no reasonable basis in the facts." (Internal quotation marks omitted.) *Simms* v. *Simms*, supra, 283 Conn. 502. In making this determination, we allow every reasonable presump-

tion in favor of the correctness of the trial court's action. *Bender* v. *Bender*, supra, 258 Conn. 740. We will reverse a trial court's ruling if, in exercising its discretion, it applies the wrong standard of law. *Borkowski* v. *Borkowski*, supra, 228 Conn. 740. In this case, although the trial court's decision to give most of the liquid assets to the plaintiff and most of the illiquid assets to the defendant may appear unfair, the court applied the proper legal principles. Furthermore, the plaintiff was a stay-at-home mother, the defendant was in his early fifties and at the height of his earning capacity, which was substantial, and the 60 to 40 percent division of assets did not overwhelmingly favor the plaintiff. Accordingly, we cannot conclude that the court abused its broad discretion in dividing the parties' assets without regard for their tax implications.

## IV

## REMEDY

"We previously have characterized the financial orders in dissolution proceedings as resembling a mosaic, in which all the various financial components are carefully interwoven with one another." (Internal quotation marks omitted.) *Finan* v. *Finan*, 287 Conn. 491, 509, 949 A.2d 468 (2008). Accordingly, "when an appellate court reverses a trial court judgment based on an improper alimony, property distribution, or child support award, the appellate court's remand typically authorizes the trial court to reconsider all of the financial orders." *Smith* v. *Smith*, 249 Conn. 265, 277, 752 A.2d 1023 (1999). We also have stated, however, that "[e]very improper order . . . does not necessarily merit a reconsideration of all of the trial court's financial orders. A financial order is severable when it is not in any way interdependent with other orders and is not improperly based on a factor that is linked to other factors." Id. In other words, an order is severable if "its

impropriety does not place the correctness of the other orders in question." Id., 279; see *Lowe* v. *Lowe*, 47 Conn. App. 354, 358, 704 A.2d 236 (1997) (reversing order of postmajority support but upholding alimony order); *Main* v. *Main*, 17 Conn. App. 670, 676, 555 A.2d 997 (reversing child support order but upholding all remaining financial orders), cert. denied, 211 Conn. 809, 559 A.2d 1142 (1989); *Zern* v. *Zern*, 15 Conn. App. 292, 296–97, 544 A.2d 244 (1988) (reversing order on division of assets but upholding alimony and child support orders).

We conclude that the financial orders requiring the defendant to pay 20 percent of his annual net cash bonus and 20 percent of any undetermined future tax refund in child support are severable from the alimony, property division and other unrelated financial orders but are inextricably linked to the remaining child support orders concerning comprehensive health insurance, unreimbursed medical expenses, education, day care, summer camp and extracurricular activities. Although the defendant does not challenge those orders, the open-ended award of bonus income constituted a significant component of the total child support award. Consequently, any new determination of child support will necessitate reconsideration of all of the child support orders to ensure that the total award will be sufficient to address the children's needs.

The judgment is reversed only with respect to the child support orders and the case is remanded to the trial court for further proceedings according to law; the judgment is affirmed in all other respects.

In this opinion NORCOTT and McLACHLAN, Js., concurred.

SCHALLER, J., concurring. Although I agree with the plurality opinion that reversal is the proper remedy in

this case, I cannot agree with the rationale offered to support that result. In particular, I believe that the plurality incorrectly bases its decision on the presumed authority of the child support and arrearage guidelines (guidelines), established pursuant to General Statutes § 46b-215a, rather than on statutory authority itself. I believe that, in above guidelines cases[1] such as this one, General Statutes §§ 46b-84 (d) and 46b-56 (c) govern the trial courts' discretion. In applying the pertinent statutes, the guidelines are simply an additional factor that the trial courts are obligated to consider.

Although it would, of course, be preferable to present a unified approach to guide the trial courts, I feel compelled to write separately to clarify what I am convinced is the correct approach for trial courts to use in determining support awards in above guidelines cases. The difference in approach is not simply a matter of choosing among relatively equivalent alternatives. A matter of principle is at stake—the discretionary authority of the trial courts. The plurality's approach, by elevating the guidelines—which were created by a commission for child support guidelines (commission) set up by the legislature—to controlling authority, infringes upon the statutory authority of trial courts to determine support. My approach accords the trial courts their full statutory authority to exercise their discretion, unfettered by the strict "principles" of the guidelines, except as a factor that must be considered. As a result of my statutory analysis, I conclude that the award was improper and, accordingly, I would reverse the trial court's financial orders in their entirety and remand the case for further proceedings.

---

[1] By "above guidelines" cases, I am referring to cases involving families whose combined net weekly income exceeds the highest amount in the guidelines schedule. "Above guidelines," therefore, is synonymous with "above schedule."

I begin by reviewing the rationale that supports the plurality's decision to reverse the judgment in this case. At the outset of its analysis, the plurality leaves no doubt about the primary basis for its reversal of the judgment of the trial court by stating emphatically: "We conclude that, although the trial court correctly acknowledged the general applicability of § 46b-84 and the guidelines, the child support order was improper because it was inconsistent with the statutory criteria and with *the principles expressed in the guidelines.*" (Emphasis added.) In other words, even though the trial court followed precisely the language of General Statutes § 46b-215b (a), which requires the trial court to consider the guidelines, the plurality reverses the trial court's judgment because it did not strictly adhere to the "principles" of the guidelines. In part I A of its opinion, after reciting relevant language from §§ 46b-84 (d) and 46b-215b (a), as well as the guidelines, the plurality calls attention to the preamble of the guidelines (preamble), which it acknowledges "is not part of the regulations . . . ."

The plurality proceeds to diverge from the proper approach by discussing various features of the preamble, including reference to the income shares model, along with lengthy quotations from out-of-state cases. The plurality then asserts categorically and, in my view, without support: "In sum, the applicable statutes, as well as the guidelines, provide that *all* child support awards must be made in accordance with the principles established therein to ensure that such awards promote 'equity,' 'uniformity' and 'consistency' for children 'at *all income levels.*' " (Emphasis in original.) This assertion is problematic because conflating the applicable statutes with the guidelines and asserting their *joint authority* is misleading. Although I fully agree that child support awards must be made in accordance with the relevant *statutes,* specifically § 46b-84, the *guidelines*

have no such controlling effect in this situation. As the plurality itself acknowledges, the preamble has no regulatory authority whatsoever and the guidelines themselves are merely one factor that must be "considered"—that is "[thought] carefully about . . . [or taken] into account"; American Heritage Dictionary of the English Language (3d Ed. 1992); in the making of awards. The plurality overlooks the significance of the fact that the legislature used the phrase "shall be considered"; General Statutes § 46b-215b (a); rather than "shall control" or "are controlling," thus purposefully—and plainly—limiting the authority of the guidelines to a factor for consideration.

The plurality argues that my interpretation of § 46b-215b (a) employs two meanings of the statutory mandate to "consider" the guidelines. This contention is based on a misunderstanding of what I believe is the approach each trial court must take when fashioning a support order. As this court recognized in *Favrow* v. *Vargas*, 222 Conn. 699, 712, 610 A.2d 1267 (1992), § 46b-215b (a) made the following four changes to the application of the guidelines: (1) the guidelines " 'shall be considered in all determinations of child support amounts within the state' "; id.; (2) " 'there shall be a rebuttable presumption that the amount of such awards which resulted from the application of such guidelines is the amount of support to be ordered' "; id.; (3) in order for the trial court to rebut this presumption in a particular case, it must make a " 'specific finding on the record that the application of the guidelines would be inequitable or inappropriate' "; id., 712–13; and (4) such specific finding must be " 'determined under the criteria established by the commission.' " Id., 713. The first step for a trial court, then, is to consider the guidelines. Such consideration will result in one of two conclusions, depending on whether the parents' combined income falls within the guidelines' schedule—either the particu-

lar case falls within the guidelines' schedule or it does not. If the case falls within the guidelines' schedule, the next step in the court's process of determining the support amount is to apply the rebuttable presumption that the amount provided in the schedule is the proper amount. In contrast, if the case is above guidelines, the court applies § 46b-84 (d) rather than the remaining three steps in § 46b-215b (a). Accordingly, the term "consider" has the same meaning in cases that fall within the guidelines and cases that are above guidelines.

Contrary to the plurality's assertion that "any deviation from the schedule or the principles on which the guidelines are based must be accompanied by the court's explanation as to why the guidelines are inequitable or inappropriate and why the deviation is necessary to meet the needs of the child," the guidelines have no such controlling authority in above guidelines situations. *Battersby* v. *Battersby*, 218 Conn. 467, 470–71, 590 A.2d 427 (1991). In an effort presumably designed to provide to the trial courts more definite authority than exists presently in above guidelines situations, the plurality elevates and expands the authority of the preamble and the guidelines to a status that neither the legislature nor the commission accomplished. In doing so, it creates an unwarranted limitation on the trial courts' discretionary authority as well as an equally unwarranted expansion of the legislative and regulatory authority. Moreover, it overlooks the existing authority of § 46b-84 (d), which unmistakably gives the trial courts the discretion to determine above guidelines support, subject to *considering* the guidelines.

In part I B of its opinion, the plurality applies the principles that it has discovered in the preamble and the guidelines to determine that the award in this case is improper because it fails to follow those principles. Although I do not at this time take issue with the princi-

ples that the plurality has found and identified in the guidelines and preamble, those principles are open to more than one interpretation. The plurality goes on to evaluate the award in this case by direct application of the guidelines and with respect to the deviation criteria, concluding that the court should treat the highest percentage set out in the guidelines' schedule as the presumptive ceiling on the child support allocation. Despite passing references to § 46b-84 (d) and the need basis for support, the plurality consistently treats the guidelines, and even the preamble, as if they were applicable and *controlling* authority.

The plurality claims to find support for its conclusion in our case law. Specifically, the plurality reasons that *Battersby* instructs that the guidelines remain applicable in above guidelines cases. In so concluding, the plurality places great emphasis on the fact that this court, in *Battersby*, noted with approval that the trial court had "considered the [g]uidelines, found the chart inapplicable for arriving at a presumptive support amount, and considered the statutory criteria and *other [g]uideline factors* in arriving at its decision." (Emphasis added.) *Battersby* v. *Battersby*, supra, 218 Conn. 472. The plurality reasons, therefore, that *Battersby*, through this endorsement of the trial court's consideration of the guidelines, supports its conclusion that " 'other [g]uideline factors' " are relevant to the determination of the support award in above guidelines cases. I do not read *Battersby* as standing for that proposition and find other statements by the court more persuasive—and more indicative—of the holding in *Battersby*.

In construing § 46b-215b, the court in *Battersby* stated: "The statute does not, despite . . . assertions to the contrary, require the trial courts to *apply* the [g]uidelines to all determinations of child support . . . . It requires only that the trial court consider the [g]uidelines. Moreover, the [g]uidelines do not contain

provisions for disposable income in excess of $750. . . . Absent ambiguity, the courts cannot read into statutes, by construction, provisions that are not clearly stated. . . .

*"There are no provisions for extrapolating to higher income levels the percentages or award amounts set forth in the [g]uidelines [schedule]. If the legislature or commission had intended to provide for such extrapolation of the [schedule], it could have said so.* Two long-standing rules of statutory construction are that a court may not by construction supply omissions in a statute simply because it appears that good reasons exist for adding them . . . and that a court must construe a statute as it finds it, without reference to whether it thinks the statute would have been or could be improved by the inclusion of other provisions. . . . Regardless of what the parties or the court think the [g]uidelines should provide, the fact is inescapable that they contain no provisions for parties whose income exceeds $750 per week. The task of promulgating provisions to cover such a situation lies with the legislature or its commission, not with the court." (Citations omitted; emphasis altered.) Id., 469–71. This admonition is highly relevant to what the plurality attempts to accomplish. Clearly, *Battersby* cannot be read to bar the use of percentages greater than the highest provided for in the schedule. See id.

In its conclusion concerning this issue, the plurality asserts that "the guidelines do not cease to apply and permit trial courts unlimited discretion in setting child support awards merely because the income of a particular family exceeds some talismanic number on a chart." Indeed, I do not dispute that the guidelines apply to the extent that they must be considered, but the guidelines' schedule does not apply and the principles of the guidelines are not controlling. In cases such as this one, the

trial courts do not have unlimited discretion because they are bound by statutory authority, namely, § 46b-84. This does not mean, of course, that the trial courts are free to disregard the progress in standardizing child support awards. Indeed, § 46-84 operates to constrain trial courts in a manner consistent with the movement away from the "flexible and nondirective approach" taken by the courts prior to the adoption of § 46b-215b. *Favrow* v. *Vargas*, supra, 222 Conn. 712. Given the statutory factors and the consideration of the guidelines, courts are hardly, as the plurality contends, "adrift, unanchored to . . . core principles" merely because their discretion is controlled by statute rather than by the guidelines.

The plurality's concern that "[r]emoving consideration of the guidelines from child support decisions deprives high income families of the fairness and consistency the guidelines require," is a legitimate one. Although it may be desirable to extend the guidelines criteria and principles—and perhaps the schedule— beyond the present income limits, such matters of policy are for the legislature to consider, not the court. See *Battersby* v. *Battersby*, supra, 218 Conn. 470 (guidelines contain no provisions for extrapolating guidelines chart to higher income indicating that legislature and commission did not intend for such extrapolation); see also *Favrow* v. *Vargas*, supra, 222 Conn. 716 (not function of trial court or this court to countermand legislative determination regarding guidelines). The plurality unduly limits the statutory authority of courts by elevating the authority of the guidelines and by relegating § 46b-84 to a minor role in order to correct what it perceives as a deficiency in the support scheme.

Neither the legislature nor the commission has ruled out taking the guidelines into account, nor specified how they should be taken into account in high income cases, other than to say that they must be "considered."

The fact remains, however, that the current guidelines' schedule does not assist in the determination of or provide a rebuttable presumption for the support award in above guidelines situations. As a result, our courts must look for authority to the governing statutes, in particular, § 46b-84 (d), but also §§ 46b-56 (c) and 46b-215b (c), in above guidelines cases. See General Statutes § 46b-215b (c) ("[i]n any proceeding for the establishment . . . of a child support award, the . . . guidelines shall be considered in addition to and *not in lieu of* the criteria for such awards established in [section] 46b-84" [emphasis added]).

Whether the trial court improperly ordered the defendant, Frank A. Maturo, to pay 20 percent of his annual net cash bonus as child support to the plaintiff, Laura E. Maturo, requires the interpretation of the statutory scheme and due consideration of the regulations, including the guidelines, which requires plenary review rather than abuse of discretion review. See *Unkelbach* v. *McNary*, 244 Conn. 350, 357, 710 A.2d 717 (1998). Based on this standard of review, I conclude that an order of a set percentage of a fluctuating income is not authorized under the applicable statutes.[2]

Because the guidelines do not control the financial scenario in this case, the question of statutory interpretation before the court is whether either § 46b-84 (d) or § 46b-56 (c) provides authority for the trial court to order a set percentage of bonus income that cannot be predicted before the end of any income year. The trial court incorrectly interpreted § 46b-84 (d) to provide a basis for its support order on an assumption that the guidelines did apply but that the deviation was justified.

---

[2] I would reach the same conclusion if the abuse of discretion standard of review were applied. Although I believe that statutory interpretation and, thus, the plenary standard of review, governs the issue, it is clear to me that under no circumstances did the trial court have discretion to award support that was unrelated to need under § 46b-84 (d).

The trial court based the support order on several factors, including "the extraordinary disparity in parental income and *the significant and essential needs of the [plaintiff] including, but not limited to, the need to provide a home for the children.*" (Emphasis added.) Neither factor is a proper consideration for child support under either § 46b-84 (d) or § 46b-56 (c). Once it is determined that the guidelines do not control, courts are left to the statutory factors, which are explicit.

The trial court in this case failed to follow the principle of § 46b-84 (d) that need is the controlling force behind the elements listed in that statute.[3] In departing from that course, the trial court issued a support order that, by its very nature, is disconnected from the need factor. An order that permits an integral part of the support order to fluctuate widely and unpredictably from year to year as the bonus element of the defendant's income fluctuates widely and unpredictably from year to year is by its very nature unmoored from the need factor that underlies § 46b-84 (d).[4] In effect, the support order as to bonus income is "open-ended" and is not related to the children's need, as that concept is expressed in § 46b-84 (d).[5] The problem with the trial court's formulation is that it does not acknowledge that

---

[3] General Statutes § 46b-84 (d) provides: "In determining whether a child is in need of maintenance and, if in need, the respective abilities of the parents to provide such maintenance and the amount thereof, the court shall consider the age, health, station, occupation, earning capacity, amount and sources of income, estate, vocational skills and employability of each . of the parents, and the age, health, station, occupation, educational status and expectation, amount and sources of income, vocational skills, employability, estate and needs of the child."

[4] Although the bonus is predictable based on the annual income calculation, it is not predictable in advance for purposes of structuring a support order.

[5] I would describe "need" as expressed in § 46b-84 (d), as *derived* need, that is, as derived from the combination of factors specified in § 46b-84 (d), which is not related to *actual* need, in an absolute sense of survival above the poverty level, for example.

the factors of "amount and sources of income" and "status" are as driven by "need" as are the other factors. See General Statutes § 46b-84 (d). Fluctuating bonus income, or other such special income sources, including the tax refunds addressed in the defendant's claims, logically cannot qualify as a basis for a set percentage order and still fulfill the requirement of being need based.

What makes this case difficult is the fluctuating nature of the special income. Need is to be determined on the basis of statutory factors. Fluctuating need, driven by unpredictable, fluctuating income, is the antithesis of what the statutory factors are designed to do. Above the guidelines, need cannot logically be dependent on the factor of fluctuating income. It is certain that all the factors listed in § 46b-84 (d) must be considered because they bear on need. The trial court, therefore, must interpret the statute as providing a correlation between income level and need. Other goals, such as entitling children to share in their parents' income or to live in financially equivalent homes, are not provided for in the statutory scheme.[6]

The trial court in this case did not decide the support award on the basis of the relationship of income to need. It simply entered a set percentage based order without explaining how it related to need, which is the crucial principle specified in the statute. The trial court did, as noted, give as reasons factors that do not appear in § 46b-84 (d), namely, "the extraordinary disparity in

---

[6] Although § 46b-56 (c) directs the court to keep in mind the best interests of the children, that important consideration does not override or supplant the factors listed in § 46b-84 (d). Surely a consideration of "best interests" does not give the court free rein to supplant the § 46b-84 (d) need based factors with a general "best interests" interpretation that would permit anything that might conceivably benefit the children. In light of the specific factors in § 46b-84 (d), the § 46b-56 (c) best interests principle seems to be no more than a *guiding light* for the § 46b-84 (d) analysis.

parental income *and the significant and essential needs of the [plaintiff]* including, but not limited to, the need to provide a home for the children." (Emphasis added.) The plaintiff's need appears to be a consideration that concerns the award of alimony. See General Statutes § 46b-82.[7]

The list of factors in § 46b-84 (d) is wide-ranging and includes many that are not cost based. Although the trial court's discretion in these matters is broad, it is not unlimited and it must be grounded on an accurate reading of the statutes. I recognize that § 46b-84 (d) includes station as well as amount and sources of income as factors to consider in determining need, but those factors do not open the door to making income based orders without demonstrating that those factors have a bearing on need.

It may be that the trial court could award a higher percentage of this special income to the plaintiff as alimony. Alimony obviously has an entirely different rationale and different consequences and is not limited to the same specific need requirement. See General Statutes § 46b-82. Currently, the present order is more in the nature of alimony, particularly because the court recited the plaintiff's needs as a reason for the order. I can fully appreciate a perception of unfairness if the defendant is allowed to retain his bonus income when, if the family were still intact, that income would have been shared and enjoyed by the spouse. My point, of course, is not that the defendant necessarily should retain the income, but that our statutory support scheme does not provide an appropriate vehicle for

---

[7] General Statutes § 46b-82 (a) provides in relevant part that "[i]n determining whether alimony shall be awarded, and the duration and amount of the award, the court shall . . . consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties . . . ."

sharing that income. If the plaintiff, however, were able to demonstrate that a set percentage of special income has a bearing on need so that the statutory scheme is met, nothing stands in the way of such an order. As it now stands, that has not been established or explained by the trial court.

Until such time as the applicability of the guidelines to high income situations may be clarified by the legislature or the commission, I urge this court to instruct that, in above guideline income situations, courts look for authority first and foremost to the statutory factors set forth in § 46b-84 (d) in light of the best interests standard of § 46b-56, while giving due *consideration* to the guidelines, along with other relevant factors. The statutory factors that are part of a need based analysis are fully adequate to guide our courts in the future and will avoid the confusion that will be produced by inflating the role of the guidelines beyond that specified by § 46b-215b (a). For the foregoing reasons, I would reverse the judgment of the trial court as to the support order and tax refund order, and remand the case for a new hearing on the financial issues.[8]

McLACHLAN, J., concurring. As attractive as the dissent's liberation from the principles of the child support and arrearage guidelines (guidelines)[1] may be for the family bench and bar in cases where the net income of the parties exceeds the amount set forth in the schedule of basic child support obligations (schedule), I find the reasoning of the plurality opinion's adherence to the

---

[8] As to part II of the plurality opinion, I share the concerns expressed with regard to the bonus award.

[1] As the plurality explains; see part I A of the plurality opinion; the legislature created a commission to oversee the establishment of the guidelines. See General Statutes § 46b-215 (a).

principles of the guidelines persuasive.[2] I, therefore, join the plurality. I also note that applying only the statutory standard of General Statutes § 46b-84 (d)[3] when the schedule is exceeded, in my view, provides a stronger case for reversing the trial court here. See *Bornemann* v. *Bornemann,* 245 Conn. 508, 531, 752 A.2d 978 (1998) ("judicial review of a trial court's exercise of its broad discretion in domestic relations cases is limited to the questions of whether the [trial] court *correctly applied the law* and could reasonably have concluded as it did" [emphasis added; internal quotation marks omitted]). Section 46b-84 (d) requires the court to consider the needs of the children and the respective abilities of *both* parents to meet those needs. The dissent attempts—unpersuasively in my view—to find unmet needs of the children due to their economic station, which must be met by wildly fluctuating payments from their father, the defendant, Frank A. Maturo, to their mother, the plaintiff, Laura E. Maturo, in amounts likely to be in the tens or even hundreds of thousands of dollars. The dissent does not, however, address the obligation of the plaintiff, the children's other parent, to contribute financially to those needs.[4]

---

[2] The principles of the guidelines implicated here are derived from the income shares model, on which the guidelines are based. Child Support and Arrearage Guidelines (2005), preamble, § (d), pp. ii–iii. The income shares model reflects the statutory obligation of both parents to contribute to child support in accordance with their abilities. See General Statutes § 46b-84 (d). Under the income shares model, the portion of family income spent on children declines as a percentage of family income as that income increases because proportionately their need decreases. Child Support and Arrearage Guidelines (2005), preamble, § (d), p. iii; see footnote 3 of this opinion.

[3] General Statutes § 46b-84 (d) provides: "In determining *whether a child is in need* of maintenance and, if in need, *the respective abilities of the parents* to provide such maintenance and the amount thereof, the court shall consider the age, health, station, occupation, earning capacity, amount and sources of income, estate, vocational skills and employability of each of the parents, and the age, health, station, occupation, educational status and expectation, amount and sources of income, vocational skills, employability, estate and needs of the child." (Emphasis added.)

[4] The plaintiff was awarded $8.1 million in cash and investment accounts, including an investment account that generated approximately $95,680 of

I write separately, however, because I believe this case well demonstrates the problems inherent in using net income to determine alimony and child support payments. The statutes authorizing such payments specify neither gross nor net income. General Statutes § 46b-61 merely authorizes the court to award "support of any minor child" without any standard.[5] Similarly, § 46b-84 (a) provides that, after the entry of a decree of legal separation or divorce, the parents shall maintain their children "according to their respected abilities," and § 46b-84 (d) provides in relevant part that the court consider in making its award "the age, health, station, occupation, earning capacity, amount and sources of income . . . of each of the parents . . . ."[6] With respect to alimony, General Statutes § 46b-82 (a) provides in relevant part that the court consider the "amount and sources of income . . . ."[7]

interest per year, based upon the income reflected in her financial affidavit. This is in addition to the trial court's generous award of alimony.

[5] General Statutes § 46b-61 provides: "In all cases in which the parents of a minor child live separately, the superior court for the judicial district where the parties or one of them resides may, on the application of either party and after notice given to the other, make any order as to the custody, care, education, visitation and support of any minor child of the parties, subject to the provisions of sections 46b-54, 46b-56, 46b-57 and 46b-66. Proceedings to obtain such orders shall be commenced by service of an application, a summons and an order to show cause."

[6] General Statutes § 46b-84 (a) provides in relevant part: "Upon or subsequent to the annulment or dissolution of any marriage or the entry of a decree of legal separation or divorce, the parents of a minor child of the marriage, shall maintain the child according to their respective abilities, if the child is in need of maintenance. . . ."

[7] General Statutes § 46b-82 provides in relevant part: "(a) . . . In determining whether alimony shall be awarded, and the duration and amount of the award, the court . . . shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to section 46b-81, and, in the case of a parent to whom the custody of minor children has been awarded, the desirability of such parent's securing employment.

"(b) Any postjudgment procedure afforded by chapter 906 shall be available to secure the present and future financial interests of a party in connection with a final order for the periodic payment of alimony."

This court and other courts in our state have repeatedly indicated that "[i]t is well settled that a court must base child support and alimony orders on the available net income of the parties, not gross income." *Morris* v. *Morris*, 262 Conn. 299, 306, 811 A.2d 1283 (2003); *Auerbach* v. *Auerbach*, 113 Conn. App. 318, 338, 966 A.2d 292, cert. denied, 292 Conn. 901, 971 A.2d 40 (2009); see also *Fahy* v. *Fahy*, 227 Conn. 505, 517, 630 A.2d 1328 (1993) (standard for determining alimony is net income, not gross income); *Collette* v. *Collette*, 177 Conn. 465, 469, 418 A.2d 891 (1979) (same); *Tobey* v. *Tobey*, 165 Conn. 742, 747, 345 A.2d 21 (1974) ("Gross earnings is not a criterion for awards of alimony. It is the net income, which is available to the defendant, which the court must consider."); *Heard* v. *Heard*, 116 Conn. 632, 634, 166 A. 67 (1933) (net income used to determine alimony); *Ludgin* v. *McGowan*, 64 Conn. App. 355, 358–59, 780 A.2d 198 (2001) (reversing trial court's financial orders when court relied on parties' gross rather than net income); *Febbroriello* v. *Febbroriello*, 21 Conn. App. 200, 202, 572 A.2d 1032 (1990) (trial court must base periodic alimony and child support orders on available net income); *Kaplin* v. *Kaplan*, 1 Conn. Sup. 175, 175–76 (1935) (modifying alimony based on defendant's net income).

Although this is stated as a settled principle of Connecticut law, gross income rather than net income apparently has been used in fashioning support awards in numerous cases, and these orders have been upheld. For example, recently the Appellate Court stated that the mere reference to gross income in entering financial orders may not be determinative. *Hughes* v. *Hughes*, 95 Conn. App. 200, 206, 895 A.2d 274 (2006). In an obvious effort to sustain a trial court's order based on gross income, the Appellate Court, quoting from the trial court, reasoned that the trial court "list[ed] the gross earnings of the plaintiff to illustrate the capability

and ability he has displayed and the pay he has received for his efforts. Since his earned income fluctuates from year to year, the court will provide for a formula for the periodic alimony and child support. Each party has submitted a proposal in this respect in their proposed orders." (Internal quotation marks omitted.) Id. The Appellate Court continued: "Indeed, the plaintiff's proposed orders . . . suggest an unallocated alimony and child support order on the basis of his gross annual cash compensation from employment. The court further noted the gross and net values of the plaintiff's most recent cash bonus. Throughout its decision, the court made frequent reference to the parties' financial affidavits. The court also considered the tax returns, which disclosed not only the plaintiff's gross income, but also his total tax liability and, thus, his net disposable income. The court had before it ample evidence from which it could determine the plaintiff's net income and the respective financial needs and abilities of each party." Id., 206–207. This is not the only case in which the Appellate Court has carefully scrutinized the totality of the trial court's award in order to uphold an order that may have appeared to be based solely on gross income because of other information in the record with respect to the parties' net incomes. See, e.g., *Kelman* v. *Kelman*, 86 Conn. App. 120, 123–24, 860 A.2d 292 (2004), cert. denied, 273 Conn. 911, 870 A.2d 1079 (2005).

Indeed, it is quite common for parties entering into agreements settling dissolution cases to provide for payments of alimony based on the gross income of the payor. See, e.g., *Issler* v. *Issler*, 250 Conn. 226, 229, 737 A.2d 383 (1999); *Signore* v. *Signore*, 110 Conn. App. 126, 127–28, 954 A.2d 245 (2008). This is because alimony is deductible from the income of the payor and taxable to the payee. See *Fahy* v. *Fahy*, supra, 227 Conn. 516 n.6. If the alimony is ordered paid out of net income,

the true net is arguably impossible to determine because the alimony when paid results in additional deduction to the payor, reducing the tax liability and increasing the net income. In order to determine an award based upon the payor's true net income an almost endless number of calculations and recalculations would be required.[8]

The most significant problem with using net income is calculating the true net income. Net income requires a determination of the correct amount of deductions, including federal, state and local income taxes, which can be difficult to calculate and even more difficult to verify without knowing all of an individual's deductions. In contrast, gross income from all sources is much more easily and accurately determined. Gross income generally includes income from all sources earned and unearned, taxable and nontaxable. Although I recognize that determining child support on the basis of gross income, rather than net income, would require a revision of the guidelines, there are many states that use gross income to calculate child support and merely use lower percentage figures for support than those used in Connecticut.[9]

---

[8] This case highlights the difficulty of using a net income approach because of the following situation, which could easily occur. Assume the defendant is awarded a bonus in December of year one and makes his alimony payment that December. Because the alimony payment is deductible, the defendant's tax liability will be decreased and, depending upon other income and deductions (yet another problem), he will receive a tax refund in year two that arguably is attributable to the alimony that was paid in December of year one. The deduction requires the payment of additional alimony in year two, which of course is deductible in year two and leads to another tax refund in year three. Assuming bonuses are received in successive years, this problem will repeat itself indefinitely.

[9] It appears that some states use gross income for making child support while others use net income. All three of our adjoining states use gross income for the purpose of determining child support. See, e.g., N.Y. Dom. Rel. Law § 240.1-b (McKinney Sup. 2010). In Massachusetts, the child support guidelines are based on gross income. See Commonwealth of Massachusetts, Administrative Office of the Trial Court, "Child Support Guidelines" (2009), available at http://www.mass.gov/courts/childsupport/guidelines.pdf, p. 2

The method used by the trial court in this case to provide for the escalator payments demonstrates the folly and difficulty of requiring that these orders be based solely upon the net income of the payor. Accordingly, I would revisit this "settled" principle because it is impractical to apply and, significantly, is not required by statute. Instead, I would allow trial courts the discretion to use gross income in all support determinations.[10]

VERTEFEUILLE, J., with whom KATZ and PALMER, Js., join, dissenting in part. I agree with and join part III of the majority opinion. I disagree, however, with the plurality's conclusion in part I of its opinion.[1]

In part I of its opinion, the plurality concludes that the trial court applied the wrong standard of law when

(last visited February 23, 2010). The same is true for Rhode Island. See Rhode Island Family Court, "Administrative Order 2007–03: Rhode Island Family Court Child Support Formula and Guidelines" (2007), available at http://www.csc.ri.gov/downloads/admin_order2007_03.pdf, p. 3 (last visited February 23, 2010).

[10] Massachusetts, by statute, bases alimony on gross income. See, e.g., *Britton* v. *Britton*, 69 Mass. App. 23, 27, 865 N.E.2d 1174 (2007) (in awarding alimony, trial court properly considered husband's gross income and other factors listed in Mass. Gen. Laws c. 208, § 34 [2003]). A court may consider the tax effects of its orders upon the parties; see *Early* v. *Early*, 413 Mass. 720, 728, 604 N.E.2d 17 (1992); but such consideration is discretionary in the absence of a request to do so. See *Bennett* v. *Bennett*, 15 Mass. App. 999, 1000, 448 N.E.2d 77 (1983). New York uses an all income approach and directs the court to consider the tax consequences of its orders. See N.Y. Dom. Rel. Law § 236 B 6 a (1) and (7) (McKinney Sup. 2010). In Rhode Island, the court must consider the supporting spouse's "earned and unearned income" and "ability to pay." R.I. Gen. Laws § 15-5-16 (b) (2) (ii) (F) (2003). Thus, the court is required to consider the "economic situation of the parties viewed in light of the financial exigencies of one spouse and the ability of the other spouse to meet those needs." *Fisk* v. *Fisk*, 537 A.2d 418, 421 (R.I. 1988). The decision to take into account the tax consequences of property distribution is subject to the discretion of the trial court. *Koutroumanos* v. *Tzeremes*, 865 A.2d 1091, 1100 (R.I. 2005).

[1] I also disagree with part II of the plurality opinion as it relates to the child support award for the same reasons as explained herein and therefore do not separately address that part of the plurality opinion.

it entered an order requiring the defendant, Frank A. Maturo, to pay 20 percent of his annual bonus as supplemental child support for his two minor children because this order is inconsistent with the applicable statutory criteria and the applicable child support and arrearage guidelines (guidelines). The plurality further concludes that the child support order was improper because it was an open-ended, variable child support award at a higher percentage of the defendant's net income than the 15.89 percent that is applied at the upper end of the schedule of basic child support guidelines (schedule), and was not reasonably related to the needs of the children. I disagree with these conclusions for several reasons. First, I disagree with the plurality that the guidelines control the trial court's determination of child support for this high income family. Second, even if the guidelines were determinative for this high income family, I disagree with the plurality that the trial court's award requiring the defendant to pay 20 percent of the net cash portion of his annual bonus as supplemental child support constitutes an abuse of discretion. Third, I disagree with the plurality that the trial court did not properly consider and apply the factors set forth in General Statutes § 46b-84. Finally, I also disagree with the plurality's cramped view of what constitutes "the needs of the child" for purposes of our child support statutes and guidelines.

The plurality opinion sets forth the facts found by the trial court. The following additional facts, however, are also relevant to the issue on appeal. In ordering the defendant to pay child support in the amount of $636 per week plus 20 percent of his annual net cash bonus after state and federal taxes were deducted, the trial court stated the following: "The [guidelines] reach a maximum weekly income of $4000 per week and the [defendant's] income is well in excess of $5000 per week. The basis for the deviation from the [guidelines]

is the [defendant's] substantial assets, the [defendant's] superior earning capacity, the extraordinary disparity in parental income and the significant and essential needs of the [plaintiff, Laura E. Maturo] including, but not limited to, the need to provide a home for the children. The court is also making this order because it has not considered the [defendant's] yearly noncash compensation (composed of stock options and restricted stock in the amount of $530,000 for 2005 and received in January, 2006) in making its alimony and child support awards. The court did consider the [defendant's] stock options and restricted stock in the property division."

I agree with the plurality with respect to our standard of review. "The well settled standard of review in domestic relations cases is that this court will not disturb trial court orders unless the trial court has abused its legal discretion or its findings have no reasonable basis in the facts. . . . As has often been explained, the foundation for this standard is that the trial court is in a clearly advantageous position to assess the personal factors significant to a domestic relations case . . . ." (Internal quotation marks omitted.) *Simms* v. *Simms*, 283 Conn. 494, 502, 927 A.2d 894 (2007), quoting *Borkowski* v. *Borkowski*, 228 Conn. 729, 739, 638 A.2d 1060 (1994). "Notwithstanding the great deference accorded the trial court in dissolution proceedings, a trial court's ruling . . . may be reversed if, in the exercise of its discretion, the trial court applies the wrong standard of law." *Borkowski* v. *Borkowski*, supra, 740. I further agree with the plurality's conclusion that "[t]he question of whether, and to what extent, the child support guidelines apply, however, is a question of law over which this court should exercise plenary review." I disagree, however, with the plurality's application of this standard of review to the present case.

My first disagreement is with the plurality's threshold conclusion that the guidelines are controlling with regard to the determination of child support for this high income family. Piecing together words from various parts of the applicable statutes, guidelines and the preamble to the guidelines, the plurality concludes that, "[i]n sum, the applicable statutes, as well as the guidelines, provide that all child support awards must be made in accordance with the principles established therein to ensure that such awards promote 'equity,' 'uniformity' and 'consistency' for children 'at all income levels.' "[2] The plurality concludes that "[a]lthough the guidelines grant courts discretion to make awards on a 'case-by-case' basis above the amount prescribed for a family at the upper limit of the schedule when the combined net weekly income of the parents exceeds that limit, which is presently $4000 . . . the guidelines also indicate that such awards should follow the principle expressly acknowledged in the preamble and reflected in the schedule that the child support obligation as a percentage of combined net weekly income should decline as the income level rises." I disagree.

I begin with General Statutes § 46b-215b (a),[3] which provides in relevant part that "[t]he . . . guidelines

[2] The plurality also concludes that "although courts may, in the exercise of their discretion, determine the correct percentage of the combined net weekly income assigned to child support in light of the circumstances in each particular case, including a consideration of other, additional obligations imposed on the noncustodial parent, any deviation from the schedule or the principles on which the guidelines are based must be accompanied by the court's explanation as to why the guidelines are inequitable or inappropriate and why the deviation is necessary to met the needs of the child." The plurality further concludes that the trial court improperly applied the deviation criteria in the present case. Because I conclude that the guidelines are not determinative in the case of high income families, I do not address whether the trial court properly applied the deviation criteria.

[3] General Statutes § 46b-215b provides in relevant part: "(a) The child support guidelines established pursuant to section 46b-215a and in effect on the date of the support determination shall be considered in all determinations of child support amounts, including any past-due support amounts, and payment on arrearages and past-due support within the state. In all

. . . shall be considered in all determinations of child support amounts . . . ." Thus, a trial court is required to begin with the guidelines when it is called upon to establish a child support order. Section 46b-215b (a) further establishes that there shall be a rebuttable presumption that the amount of support to be ordered by the court will be the amount established in the guidelines.

I turn next to the guidelines themselves. There is no dispute that the maximum net income addressed by the guidelines schedule is $4000 per week and that the net income of the defendant in the present case at the time of dissolution exceeded $5000 per week. The preamble to the guidelines specifically states that courts "remain free to fashion appropriate child support awards on a case-by-case basis where the combined income exceeds the range of the schedule . . . ." Child Support and Arrearage Guidelines (2005), preamble, § (e) (6), p. vi. A review of the history of the guidelines demonstrates the intent of the commission for family support guidelines (commission) with regard to high income families. In 1991, the first year in which the commission promulgated the guidelines, the preamble stated, "[w]hen the combined family income exceeds the cap, the guidelines *do not apply* except that the order should not be less than that which is applicable at the highest income level within the guidelines, subject to the court's discre-

such determinations, there shall be a rebuttable presumption that the amount of such awards which resulted from the application of such guidelines is the amount of support, including any past-due support, or payment on any arrearage or past-due support to be ordered. A specific finding on the record that the application of the guidelines would be inequitable or inappropriate in a particular case, as determined under criteria established by the Commission for Child Support Guidelines under section 46b-215a, shall be required in order to rebut the presumption in such case. . . .

"(c) In any proceeding for the establishment or modification of a child support award, the child support guidelines shall be considered in addition to and not in lieu of the criteria for such awards established in sections 46b-84, 46b-86, 46b-130, 46b-171, 46b-172, 46b-215, 17b-179 and 17b-745."

tion." (Emphasis added.) Child Support and Arrearage Guidelines (1991), preamble, § (c) (3), p. 4. When the commission published its updated edition of the guidelines in 1994, the commission "extended the applicable range of the guidelines under these regulations. . . . [Above that level], courts *remain free* to fashion appropriate child support awards on a case-by-case basis, provided the amount of support prescribed at the [highest income level contained in the schedule] is presumed to be the minimum that should be ordered in such cases." (Emphasis added.) Child Support and Arrearage Guidelines (1994), preamble, § (e) (1), p. vii. Thus, contrary to the conclusion of the plurality, the preamble to the guidelines demonstrates that the commission intended for the trial courts to have discretion to determine child support awards "on a case-by-case basis" when family income exceeds the highest income level contained in the guidelines, although the guidelines do establish the minimum level of presumptive weekly support that should be awarded in such cases. Id. The guidelines therefore do not establish any presumptive amount of child support for high income families, other than the minimum weekly support amount.

My understanding of the role that the guidelines play in establishing child support awards for high income families is further informed by this court's decision in *Battersby* v. *Battersby*, 218 Conn. 467, 590 A.2d 427 (1991). In that case, the trial court concluded that the guidelines did not apply to the family before the court because the family income exceeded the highest income shown on the guidelines schedule. The trial court therefore exercised its discretion and ordered child support based on a number of considerations, including the statutory factors. The defendant father thereafter appealed, claiming that: (1) the trial court's refusal to apply the guidelines violated the requirement in § 46b-215b (a) that the guidelines "shall be considered"; and

(2) the trial court improperly failed to extrapolate from the guidelines schedule by applying the highest percentage in the schedule to the family's excess income. This court rejected both claims and affirmed the judgment of the trial court. This court determined, first, that § 46b-215b (a) "requires only that the trial court consider the [g]uidelines" and that the trial court had done so. Id., 470. Second, this court found that the trial court had the authority to reject the defendant's suggested extrapolation from the guidelines. We stated "[t]here are no provisions for extrapolating to higher income levels the percentages or award amounts set forth in the [guidelines schedule]." Id. This court concluded that the defendant's claim was without merit because "[t]he record shows that the court considered the [g]uidelines, found the [schedule] inapplicable for arriving at a presumptive support amount, and considered the statutory criteria and other [g]uideline factors in arriving at its decision." Id., 472.

The guidelines are defined as "the rules, principles, schedule and worksheet . . . for the determination of an appropriate child support award, to be used when initially establishing or modifying both temporary and permanent orders." Regs., Conn. State Agencies § 46b-215a-1 (5). Accordingly, consistent with *Battersby*, I would conclude that although the schedule set forth in the guidelines is not controlling for determining a child support award for a high income family like the one in the present case, it is appropriate for the trial court to consider the other portions of the guidelines in forming its award. For instance, in determining what constitutes income for purposes of child support it is appropriate to look to the definition of "gross income" provided in the guidelines. Moreover, as the definition of the guidelines provides, the guidelines are informed by general principles that are important to consider in all support determinations. Contrary to the plurality, how-

ever, I would rely on the entirety of the basic principles set forth in the preamble. Child Support and Arrearage Guidelines (2005), preamble, § (d), pp. ii–iii. These basic principles explain that our guidelines are based on the income shares model and further set forth the general principles underlying the income shares model. Id. I disagree, however, with the plurality that the principles of the guidelines mean merely that "spending on children declines as a proportion of family income as that income increases . . . ." Id., p. iii. Although I recognize that is one of the principles underlying the income shares model, it is not the only one. As explained more fully herein, the income shares model is guided primarily by the premise that the "child should receive the same proportion of parental income as he or she would have received if the parents lived together" and it rejects the notion that child support awards must be based on an itemized showing of need. Id., p. ii.

Thus, given the consideration requirement of § 46b-215b (a), the text, principles and schedule of the guidelines, including the preamble, and this court's ruling in *Battersby*, I would conclude that the trial court in the present case properly complied with the statute and the guidelines when it: (1) considered the guidelines; (2) determined that the defendant's income exceeded the highest income shown on the guidelines schedule; (3) ordered the highest amount of weekly support as shown on the schedule; and (4) then used its discretion to order additional support as permitted under the guidelines because the defendant's income exceeded the highest income on the schedule.

The plurality spends several pages of its opinion detailing the history of the adoption of the guidelines to demonstrate that the purpose of the guidelines was to limit judicial discretion in the area of child support determinations. Although I do not dispute that this may be the general purpose of the guidelines, the commis-

sion's explicit textual language demonstrates that it intended for courts to retain discretion when awarding child support in cases involving high income families. The plurality concludes, however, that "when a family's combined net weekly income exceeds $4000, the court should treat the percentage set forth in the schedule at the highest income level as the presumptive *ceiling* on the child support obligation, subject to rebuttal by application of the deviation criteria enumerated in the guidelines, as well as the statutory factors described in § 46b-84 (d)." (Emphasis added.) This conclusion is in direct opposition to the discretion intended and explicitly provided for by the commission with regard to high income families. Moreover, the plurality establishes a "ceiling" for child support awards for high income families despite the lack of any textual support for such a cap. The plurality acknowledges that the guidelines "are accompanied by a preamble that is not part of the regulations but is intended to assist in their interpretation." Relying on the explicit language of that preamble, I would conclude that the commission clearly did not intend for the guidelines to be determinative of the appropriate child support award for a high income family like the one in the present case.

In interpreting guidelines similar to ours, which specifically "require a court determination on a case-by-case basis" in those cases in which the income of the parent paying support exceeds $6250 per month, the Tennessee Supreme Court concluded that "[t]he guidelines' very latitude reflects this need for an exercise of discretion." *Nash* v. *Mulle*, 846 S.W.2d 803, 806 (Tenn. 1993). That court went on to state that "it would . . . be unfair to require a custodial parent to prove a specific need before the court will increase an award beyond [the highest amount contained in the guidelines]. At such high income levels, parents are unlikely to be able to 'itemize' the cost of living. Moreover, most parents

living within their means would not be able to present lists of expenditures made in the mere anticipation of more child support. Until the guidelines more specifically address support awards for the children of high-income parents, we are content to rely on the judgment of the trial courts within the bounds provided them by those guidelines." Id. Similarly, bearing in mind that the commission in this state also explicitly has chosen to allow courts to "remain free" to fashion child support awards for high income families on a case-by-case basis; Child Support and Arrearage Guidelines (2005), preamble, § (e) (6), p. vi; I would conclude that until our guidelines more specifically address support awards for the children of high income families, we must rely on the sound discretion of our trial courts in such instances.

Furthermore, even if I were to agree with the plurality that the guidelines do control the determination of child support awards for a high income family like the one in the present case, I would not conclude that the trial court abused its discretion by requiring the defendant to pay 20 percent of his annual cash bonus as additional child support rather than the 15.89 percent that the plurality concludes is appropriate.

The plurality opinion concludes that "the support payment for two children under the guidelines should presumptively not exceed 15.89 percent when the combined net weekly income of the family exceeds $4000, and, in most cases, should reflect less than that amount." In support of its conclusion, the plurality points to the schedule of presumptive support awards contained in the guidelines. Specifically, the plurality concludes that because the required support payment for two children declines from 35.99 percent when the combined net weekly income of the parties is $310, to 15.89 percent when the combined net weekly income is $4000, the support payment for those families whose

net weekly income is over $4000 should be "15.89 percent or less . . . ." I disagree and would not conclude that the trial court abused its discretion by awarding an additional 4.11 percent of the defendant's annual cash bonus as supplemental child support.

In support of its conclusion, the plurality states that the trial court was bound by "the guideline principles that a declining percentage of the combined net family income should be awarded as the income level rises and that the percentage of any future bonus allocated for child support should be 'generally consistent' . . . with the percentages established in the schedule in order to ensure consistency, uniformity and equity in the treatment of persons in such circumstances." (Citation omitted.) The plurality's conclusion in this regard is flawed. First, its approach offers no more consistency or uniformity than the approach taken by the trial court because the plurality concludes that the supplemental child support order should be 15.89 percent *or less*. Utilizing this approach, however, under the same facts as the present case, one trial court properly could order supplemental child support of 1 percent of a substantial annual bonus and another trial court properly could order supplemental child support of 15.89 percent of a substantial annual bonus. I disagree that this approach is any more consistent, uniform or equitable than the trial court's award in the present case of 20 percent of the defendant's annual cash bonus.

The plurality also relies on *Battersby* v. *Battersby,* supra, 218 Conn. 467, in support of its conclusion. I disagree with the plurality's reading of *Battersby.* In *Battersby,* as previously set forth herein, this court affirmed the judgment of the trial court, which had refused to extrapolate from the guidelines when determining a child support award based on a percentage, where the family income was above the highest level contained in the schedule and the guidelines. In

doing so, this court recognized that "[*t*]*here are no provisions for extrapolating to higher income levels the percentages or award amounts set forth in the* [*g*]*uidelines chart.* If the legislature or commission had intended to provide for such extrapolation of the chart, it could have said so. Two long-standing rules of statutory construction are that a court may not by construction supply omissions in a statute simply because it appears that good reasons exist for adding them . . . and that a court must construe a statute as it finds it, without reference to whether it thinks the statute would have been or could be improved by the inclusion of other provisions. . . . These rules of statutory construction are equally applicable to the task confronting the trial court in attempting to apply these legislatively mandated [g]uidelines." (Citations omitted; emphasis added.) Id., 470–71. This court also stated that, in its final report, the commission that originally had recommended the adoption of the guidelines had noted that "[i]t is generally accepted that the guidelines are of minimal value in framing support obligations at both the high and low ends of the income scale." (Internal quotation marks omitted.) Id., 473. Accordingly, we concluded that "the trial court had the authority to reject the defendant's suggested extrapolation of the [g]uidelines' percentage as inappropriate and inequitable in the circumstances before it." Id. Although this court in *Battersby* concluded that the trial court did not abuse its discretion by entering a support order that constituted a lower percentage of support than that contained at the highest income level on the schedule, nothing in *Battersby* suggested that a lower percentage was *required*.

The plurality also cites *Gentile* v. *Carneiro*, 107 Conn. App. 630, 946 A.2d 871 (2008), in support of its conclusion that the trial court improperly required the defendant to pay a higher percentage of his net cash bonus than the applicable percentage at the $4000 weekly

income level contained in the schedule. *Gentile,* however, is inapposite to the present case. In *Gentile,* the "[trial] court's supplemental order required the defendant [husband] to pay 50 percent of the first $20,000 in aggregate commissions that he is entitled to receive and 25 percent of any commission in excess of $20,000 that he is entitled to receive." Id., 649. The Appellate Court concluded that this supplemental order was improper because it obligated the defendant to pay a percentage of commissions that was higher than the percentage of support mandated by the schedule for his income level. Id., 650. Unlike the high income defendant in the present case, however, the income of the defendant in *Gentile* was encompassed within the schedule, and the trial court, therefore, was obligated to use the percentage contained therein.

Moreover, it is important to remember that the trial court in the present case only awarded 20 percent of the defendant's annual net *cash* bonus as supplemental child support; it did not award any of the defendant's annual stock bonus as supplemental child support. In entering the supplemental child support order, the trial court explained that "[t]he court is also making this order because it has not considered the [defendant's] yearly noncash compensation (composed of stock options and restricted stock in the amount of $530,000 for 2005 and received in . . . 2006) in making its alimony and child support awards." The trial court made no factual findings about the value of the defendant's annual stock bonus. We therefore are unable to determine the exact percentage of total family net income that is ordered for child support. It is evident, however, that if the defendant's annual stock bonus has any material value at all, then the supplemental child support ordered by the trial court would likely be less than 15.89 percent of total family net income that the plurality concludes is the ceiling for the award.

The defendant's *only* response to this analysis is factually and legally unsupported. The defendant states: "The plaintiff also asserts that the percentage of [the] defendant's bonus-based income being paid to her as support is lower than claimed by [the] defendant since [the] defendant's calculations do not include his non-cash stock bonus. . . . However, the court treated this noncash award as an asset awarded to [the] defendant as part of its property distribution, expressly excluding this from consideration of the alimony and child support awards." It is true, of course, that the trial court awarded the defendant, as part of the property settlement, all of the restricted and unexercised stock shares that the defendant had earned prior to the dissolution of the couple's marriage. Contrary to the defendant's contention, however, there is no property distribution order respecting *future* stock compensation, occurring after the dissolution, nor would one expect there to be as it is well established that such future earnings are not marital assets and, therefore, not subject to division. See, e.g., *Bornemann* v. *Bornemann*, 245 Conn. 508, 517, 752 A.2d 978 (1998) ("our broad definition of property [i]s not entirely without limitation . . . [as] property under [General Statutes] § 46b-81 includes only interests that are presently existing, as opposed to mere expectancies"); *Kiniry* v. *Kiniry*, 71 Conn. App. 614, 624, 803 A.2d 352 (2002) ("stock options that are awarded prior to the date of dissolution and awarded solely for past services are considered to be earned during the marriage and are, therefore, considered marital property subject to equitable distribution under § 46b-81"). Because the defendant's future earnings subsequent to dissolution are not marital assets, it would have been unlawful for the court to divide them as marital property, as the defendant claims the court did in this case. More importantly, there is absolutely no evidence in the record that this is what the court did—

i.e., distribute the defendant's future noncash bonus income as "assets" of the marriage.

The defendant cites to § 5 of the trial court's memorandum of decision as support for his contention that "the court treated th[e] noncash [bonus] award as an asset awarded to [the] defendant as part of its property distribution." This section of the court's decision, however, addresses child support only, not marital property distribution. In ordering the defendant to pay a portion of his net cash bonus in child support, the court emphasized that it "has not considered the [defendant's] yearly noncash compensation . . . in making its alimony and child support awards." The court then stated that it "did consider the [defendant's] *stock options and restricted stock in the property division.*" (Emphasis added.) Thus, the court clearly distinguished between "noncash *compensation*," which it elected not to levy for support purposes, and "stock options and restricted stock in the property division," which were distributed as part of the marital estate. (Emphasis added.) With respect to the stock options and restricted stock, the record reflects that the court awarded the defendant, as part of the property division, restricted shares of Merrill Lynch stock with a value of $1,850,000 and unexercised stock options with a value of $3,529,000. Those shares and options, however, were earned *prior to the dissolution of the marriage.*

I also disagree with the plurality's conclusion that the trial court did not properly apply the statutory criteria in the present case. Child support orders are governed by, inter alia, General Statutes §§ 46b-84[4] and 46b-215b.

---

[4] General Statutes § 46b-84 provides in relevant part: "(a) Upon or subsequent to the annulment or dissolution of any marriage or the entry of a decree of legal separation or divorce, the parents of a minor child of the marriage, shall maintain the child according to their respective abilities, if the child is in need of maintenance. Any postjudgment procedure afforded by chapter 906 shall be available to secure the present and future financial interests of a party in connection with a final order for the periodic payment of child support. . . .

Under § 46b-84 (a), the divorcing parents of minor children are required to maintain the children if they are "in need of maintenance." "In determining whether a child is in need of maintenance and, if in need, the respective abilities of the parents to provide such maintenance and the amount thereof, the court shall consider the age, health, station, occupation, earning capacity, amount and sources of income, estate, vocational skills and employability of each of the parents, and the age, health, station, occupation, educational status and expectation, amount and sources of income, vocational skills, employability, estate and needs of the child." General Statutes § 46b-84 (d). Section 46b-215b further provides in relevant part: "(a) The child support guidelines established pursuant to section 46b-215a and in effect on the date of the support determination shall be considered in all determinations of child support amounts, including any past-due support amounts, and payment on arrearages and past-due support within the state. In all such determinations, there shall be a rebuttable presumption that the amount of such awards which resulted from the application of such guidelines is the amount of support, including any past-due support, or payment on any arrearage or past-due support to be ordered. A specific finding on the record that the application of the guidelines would be inequitable or inappropriate in a particular case, as determined under criteria established by the Commission for Child Support Guidelines under section 46b-215a, shall be required in order to rebut the presumption in such case. . . .

---

"(d) In determining whether a child is in need of maintenance and, if in need, the respective abilities of the parents to provide such maintenance and the amount thereof, the court shall consider the age, health, station, occupation, earning capacity, amount and sources of income, estate, vocational skills and employability of each of the parents, and the age, health, station, occupation, educational status and expectation, amount and sources of income, vocational skills, employability, estate and needs of the child. . . ."

"(c) In any proceeding for the establishment or modification of a child support award, the child support guidelines shall be considered in addition to and not in lieu of the criteria for such awards established in [section] 46b-84 . . . ."

I first turn to the text of § 46b-84 (d), which sets forth the manner in which the trial court is to determine whether a child is in need of maintenance. The subsection provides: *"In determining whether a child is in need of maintenance* and, if in need, the respective abilities of the parents to provide such maintenance and the amount thereof, *the court shall consider* the age, health, station, occupation, earning capacity, amount and sources of income, estate, vocational skills and employability of each of the parents, and the age, health, station, occupation, educational status and expectation, amount and sources of income, vocational skills, employability, estate and needs of the child." (Emphasis added.) General Statutes § 46b-84 (d). Thus, by the express terms of § 46b-84 (d), the trial court is required to consider the many factors set forth in that statute in determining, first, whether the child is in need, and, second, the amount of the need.

Indeed, the punctuation of § 46b-84 (d) supports my conclusion. "Although punctuation is not generally considered an immutable aspect of a legislative enactment, given its unstable history; see *State* v. *Roque,* 190 Conn. 143, 152, 460 A.2d 26 (1983); see also 2A J. Sutherland, [Statutory Construction (4th Ed. Sands 1984)] § 47.15; it can be a useful tool for discerning legislative intent. *State* v. *Dennis,* 150 Conn. 245, 248, 188 A.2d 65 (1963); *Connecticut Chiropody Society, Inc.* v. *Murray,* 146 Conn. 613, 617, 153 A.2d 412 (1959). Thus, where a qualifying phrase is separated from several phrases preceding it by means of a comma, one may infer that the qualifying phrase is intended to apply to all its antecedents, not only the one immediately preceding it. 2A J.

Sutherland, supra, § 47.33." *Sanzone* v. *Board of Police Commissioners*, 219 Conn. 179, 189–90, 592 A.2d 912 (1991). Applying this rule to § 46b-84 (d), I would conclude that the legislature intended that trial courts examine the delineated factors both when determining whether a child is in need of maintenance and also when determining the amount of maintenance required. Thus, the statute requires that the child's need is not to be determined narrowly, but rather broadly, and only after a consideration of a variety of factors concerning the child, including "the age, health, station, occupation, educational status and expectation, amount and sources of income, vocational skills, employability, estate and needs of the child." General Statutes § 46b-84 (d). As I explain hereafter, factors under § 46b-84 (d) such as "station" and "educational status and expectation" are particularly important in analyzing the needs of the children in high income families such as the one in the present case.

General Statutes § 46b-56,[5] which also governs child support orders, imposes an additional factor to be con-

[5] General Statutes § 46b-56 provides in relevant part: "(a) In any controversy before the Superior Court as to the custody or care of minor children, and at any time after the return day of any complaint under section 46b-45, the court may make or modify any proper order regarding the custody, care, education, visitation and support of the children if it has jurisdiction . . . .

"(c) In making or modifying any order as provided in subsections (a) and (b) of this section, the court shall consider the best interests of the child, and in doing so may consider, but shall not be limited to, one or more of the following factors: (1) The temperament and developmental needs of the child; (2) the capacity and the disposition of the parents to understand and meet the needs of the child; (3) any relevant and material information obtained from the child, including the informed preferences of the child; (4) the wishes of the child's parents as to custody; (5) the past and current interaction and relationship of the child with each parent, the child's siblings and any other person who may significantly affect the best interests of the child; (6) the willingness and ability of each parent to facilitate and encourage such continuing parent-child relationship between the child and the other parent as is appropriate, including compliance with any court orders; (7) any manipulation by or coercive behavior of the parents in an effort to

sidered in determining child support orders. Section 46b-56 (c) provides in relevant part that, "[i]n making or modifying any order [regarding the custody, care, education, visitation and support of the children], the court shall consider the best interests of the child . . . ." This statute adds the broad consideration, "best interests of the child" to the many other factors that must be considered in determining child support orders.

It is well established that in determining child support awards, courts should consider "the standard of living that the child or children would have enjoyed if the family had continued to live together." 24A Am. Jur. 2d 414, Divorce and Separation § 942 (2008). This court repeatedly has recognized that it is proper for courts to consider the parents' standard of living in determining child support payments. See *Blake* v. *Blake*, 207 Conn. 217, 232, 541 A.2d 1201 (1988) ("[o]ur courts have also considered the parties' standard of living in determining child support payments"), citing *Burke* v. *Burke*, 137 Conn. 74, 76–81, 75 A.2d 42 (1950); *Morris* v. *Morris*, 132 Conn. 188, 193–94, 43 A.2d 463 (1945) ("[w]e cannot

involve the child in the parents' dispute; (8) the ability of each parent to be actively involved in the life of the child; (9) the child's adjustment to his or her home, school and community environments; (10) the length of time that the child has lived in a stable and satisfactory environment and the desirability of maintaining continuity in such environment, provided the court may consider favorably a parent who voluntarily leaves the child's family home pendente lite in order to alleviate stress in the household; (11) the stability of the child's existing or proposed residences, or both; (12) the mental and physical health of all individuals involved, except that a disability of a proposed custodial parent or other party, in and of itself, shall not be determinative of custody unless the proposed custodial arrangement is not in the best interests of the child; (13) the child's cultural background; (14) the effect on the child of the actions of an abuser, if any domestic violence has occurred between the parents or between a parent and another individual or the child; (15) whether the child or a sibling of the child has been abused or neglected, as defined respectively in section 46b-120; and (16) whether the party satisfactorily completed participation in a parenting education program established pursuant to section 46b-69b. The court is not required to assign any weight to any of the factors that it considers. . . ."

hold that the trial court, taking into consideration as it did the financial circumstances and standard of living of the parties, abused its discretion in ordering payments in the amounts stated"). This court previously has concluded that the use of the term "station" in the marital dissolution statutes requires the court to consider the standard of living of the parties. See *Blake* v. *Blake*, supra, 232 ("The most pertinent definition of 'station' in Webster, Third New International Dictionary, is 'social standing.' A person's social standing is strongly correlated to his standard of living, although other factors may be important as well. Our courts have frequently considered the standard of living enjoyed by spouses in determining alimony or in dividing marital property.").

On the basis of the foregoing, I would conclude that, in the present case, the trial court did not abuse its discretion by ordering child support in the form of 20 percent of the defendant's annual cash bonus for the children, now age sixteen, whose father earns an extraordinarily high income and who have experienced a lifestyle consistent with this high income for their entire lives. The trial court's entry of a weekly child support order of $636, the maximum amount under the guidelines schedule, plus 20 percent of the defendant's annual net cash bonus, is in accord with the directive of § 46b-84 (d) to consider the age, station and educational status and expectation of the children, and of § 46b-56, which requires a consideration of the children's best interests. The trial court's orders in the present case did not include an educational support award; instead, the trial court "reserve[d] jurisdiction as to how the children's college expenses shall be paid." It is not unreasonable, however, to infer that the trial court intended that a portion of the supplemental child support order might be put aside to meet the cost of college, particularly considering the fact that both parents are

college educated and the defendant holds an advanced degree. In addition, it was reasonable for the trial court to anticipate expenses for such items as automobiles, automobile liability insurance, extended vacations, specialized camps and other luxuries that these teenagers likely would have enjoyed had their parents not divorced. The trial court's supplemental support order ensures that the children will have the luxuries that they would have received if the family had remained intact.

Finally, I also disagree with the plurality's cramped reading of the statutes and the guidelines with regard to the needs of the children. The plurality concludes as follows: "[W]hen there is a proven, routine consistency in annual bonus income, as when a bonus is based on an established percentage of a party's steady income, an additional award of child support that represents a percentage of the net cash bonus also may be appropriate if justified by the needs of the child. When there is a history of wildly fluctuating bonuses, however, or a reasonable expectation that future bonuses will vary substantially, as in the present case, an award based on a fixed percentage of the net cash bonus is impermissible unless it can be linked to the child's characteristics and demonstrated needs." In my view, this approach is in direct conflict with the applicable statutes which, as discussed previously herein, demonstrate that child support orders are to be awarded by taking into account a wide variety of factors beyond the demonstrated physical needs of the children.

The guidelines themselves provide evidence that this state has explicitly rejected the notion that child support determinations should be based solely on the costs associated with meeting the physical needs of the child. The preamble to the guidelines explicitly explains that "[t]he [guidelines] are based on the [i]ncome [s]hares [m]odel. The [i]ncome [s]hares [m]odel presumes that the child should receive the same proportion of parental

income as he or she would have received if the parents lived together. Underlying the income shares model, therefore, is the policy that the parents should bear any additional expenses resulting from the maintenance of two separate households instead of one, since it is not the child's decision that the parents divorce, separate, or otherwise live separately.

"The [i]ncome [s]hares [m]odel has proven to be the most widely accepted, particularly due to its consideration of the income of both parents. About two-thirds of the states follow the income shares model . . . .

"The [i]ncome [s]hares [m]odel reflects presently available data on the average costs of raising children in households across a wide range of incomes and family sizes. Because household spending on behalf of children is intertwined with spending on behalf of adults for most expenditure categories, it is difficult to determine the exact proportion allocated to children in individual cases, even with exhaustive financial affidavits. However, a number of authoritative economic studies based on national data provide reliable estimates of the average amount of household expenditures on children in intact households. The studies have found that the proportion of household spending devoted to children is systematically and consistently related to the level of household income and to the number of children." Child Support and Arrearage Guidelines (2005), preamble, § (d), pp. ii–iii. "Rather than defining the individual needs of a child on a case-by-case basis as is required by the cost sharing methodology, an income sharing approach looks to economic evidence to establish an identified portion of the income of an intact family which is spent on children." 3 A. Rutkin, Family Law and Practice (2009) § 33.04[2] [c]; see also *Jenkins* v. *Jenkins*, 243 Conn. 584, 594, 704 A.2d 231 (1998) ("The guidelines provide that the basic principles from which they were derived are found in the 'income shares

model' of calculation of child support. . . . Therefore, in order to be in accord with the guidelines, the determination of a parent's child support obligation must account for all of the income that would have been available to support the children had the family remained together." [Citation omitted.]); 3 A. Rutkin, supra, § 33.04[2] [c] (income shares model "incorporates the statutory standard set out in the Uniform Marriage and Divorce Act, to wit: 'In a proceeding for dissolution of marriage, legal separation, maintenance, or child support, the court may order either or both parents to pay an amount reasonable or necessary for his support, without regard to marital misconduct, after considering all relevant factors including . . . [3] the standard of living the child would have enjoyed had the marriage not been dissolved' "). Indeed, since the guidelines first took effect approximately twenty years ago, they "have shifted the evidentiary focus from proving the needs of the children to establishing the parents' income." L. Morgan, Child Support Guidelines: Interpretation and Application (Sup. 2009) § 2.03 [a]. The approach taken by the plurality is inconsistent with the income shares model. Consistent with the income shares model, the schedule contained in the guidelines focuses on the net income of the parties, not on proven costs for raising the child or children.

The plurality cites *Ford* v. *Ford*, 600 A.2d 25, 30 (Del. 1991), and *In re Marriage of Bush*, 191 Ill. App. 3d 249, 261, 547 N.E.2d 590 (1989), appeal denied, 129 Ill. 2d 561, 550 N.E.2d 553 (1990), for the proposition that higher income families devote more income to savings and less on needs; therefore, a support award in excess of the child's reasonable needs would constitute a distribution of the noncustodial parent's estate and a windfall to the child. Although the Delaware and Illinois courts did adopt this approach at the time those cases were decided, it is generally understood that when the states

first began to adopt the child support guidelines, "a body of case law developed that there was such a thing as 'excess' child support, that is, too much child support that was in excess of the child's 'reasonable needs." L. Morgan, supra, § 4.07 [b] [2].

"In recent years, there has been a definite trend away from the type of reasoning described in [*Ford* v. *Ford*, supra, 600 A.2d 30, and *In re Marriage of Bush*, supra, 191 Ill. App. 3d 249]. Instead there has been an increasing recognition that a child is entitled to share in the increasing good fortune and wealth of his/her parents. This new wave of cases started with the recognition that the appropriate standard of living for a child of affluent parents is affluence matching that of the parents, regardless of the 'wishes' of the parent to direct the upbringing of the child." L. Morgan, supra, § 4.07 [b] [3].

The Pennsylvania Superior Court explained this concept in the case of *Branch* v. *Jackson*, 427 Pa. Super. 417, 420, 629 A.2d 170 (1993), as follows: "necessaries, and luxuries are relative matters. . . . Children of wealthy parents are entitled to the educational advantages of travel, private lessons in music, drama, swimming, horseback riding, and other activities in which they show interest and ability. They are entitled to the best medical care, good clothes, and familiarity with good restaurants, good hotels, good shows, and good camps. It is possible that a child with nothing more than a house to shelter him, a coat to keep him warm and sufficient food to keep him healthy will be happier and more successful than a child who has all the advantages, but most parents strive and sacrifice to give their children advantages which cost money.

"A wealthy father has a legal duty to give his children the advantages which his financial status indicates to be reasonable . . . . [A parent] should not be forced

by a support order to make personal sacrifices to give them all the advantages to which we referred above, but a father with the assets, the youth, and the ability of the defendant can furnish his children with these advantages without any recognizable sacrifice on his part." (Internal quotation marks omitted.)

I also find persuasive the decision of the California Court of Appeal in *In re Marriage of Ostler & Smith*, 223 Cal. App. 3d 33, 272 Cal. Rptr. 560 (1990). In that case, the husband appealed from a judgment in a dissolution of marriage action awarding child support at the maximum amount allowed by the applicable support guidelines plus additional child support equal to 10 percent of the husband's annual bonus per child. Id., 42. On appeal, the husband claimed that the trial court had abused its discretion because there was no evidence that the children needed the additional award and the trial court improperly had applied a mechanical percentage formula to the award. Id., 51. The Court of Appeal affirmed the judgment of the trial court, concluding as follows: "Overall, there was sufficient evidence for the court to determine approximately what the needs were and would be for boys of about nine and fourteen years of age. Determining the amount comes within the rule that the trier of fact may fix a reasonable sum where the matters are nontechnical in nature and of common knowledge. . . . The court could call on its own knowledge of such things as inflation, the cost of car insurance for male teenaged drivers, the cost of major vacation trips, and allowances as the boys aged, as well as the increased cost of their food and clothing." (Citation omitted; internal quotation marks omitted.) Id., 53–54; see also *In re Marriage of Mosley*, 165 Cal. App. 4th 1375, 1387, 82 Cal. Rptr. 3d 497 (2008) (The Court of Appeal remanded the case, requiring the trial court to "include in its order a method for requiring [the husband] to pay support obligations based on any

bonus income that he may in fact receive. It may, for example, fashion an additional award, over and above guideline support, expressed as a fraction or percentage of any discretionary bonus actually received.").

The plurality also relies on *In re Marriage of Bush*, supra, 191 Ill. App. 3d 255, wherein the respondent father had been ordered to pay 20 percent of his net annual income into a trust fund for his child in addition to $800 per month in cash child support to the mother. On appeal, the respondent father claimed that the child support award was excessive because it was far more than was necessary to meet the child's reasonable needs, particularly in light of each parent's separate abilities to financially care for the child. Id., 259. The Illinois Appellate Court held that the trial court's overall award of 20 percent of the respondent's net income was excessive for a four year old child, concluding that "where the individual incomes of both parents are more than sufficient to provide the reasonable needs of the parties' children, taking into account the [lifestyle] the children would have absent the dissolution, the court is justified in setting a figure below the guideline amount." Id., 260. Subsequently, *In re Marriage of Bush* has been held to have limited application only where the individual incomes of both parents are more than sufficient to meet the needs of the child. Indeed, in a recent case examining the holding of *In re Marriage of Bush*, the Illinois Appellate Court stated that "[w]e are aware that the amount paid in child support currently exceeds the monthly expenses for the entire household, but a child's entitlement to a level of support is not limited to his or her 'shown needs.' [The] argument that [a minor child] is only entitled to her 'shown needs' has been rejected by the Illinois Supreme Court . . . for the reason that it, in effect, ignores the consideration of the standard of living that the child would have enjoyed if the marriage had not been dissolved."

*In re Marriage of Garrett,* 336 Ill. App. 3d 1018, 1023, 785 N.E.2d 172, appeal denied, 204 Ill. 2d 658, 792 N.E.2d 306 (2003). In the present case, the defendant does not assert and the evidence does not support that the individual incomes of both parents are more than sufficient to meet the needs of the children. Accordingly, I conclude that the reasoning in *In re Marriage of Bush,* supra, 249, is not applicable to the present case.

The plurality's focus on the physical needs of the children is a step backward and ignores the "new wave" of cases that recognizes the significance of the standard of living of children of affluent parents. See L. Morgan, supra, § 4.07 [b] [3]. Consistent with the newer approach, I would conclude that, on the basis of the extraordinarily high income of the defendant in the present case, the trial court did not abuse its discretion in ordering him to pay 20 percent of his annual cash bonus as additional child support in order to "furnish his children with [the advantages that children of wealthy parents are entitled to] . . . ." (Internal quotation marks omitted.) *Branch* v. *Jackson,* supra, 427 Pa. Super. 420.

I therefore respectfully dissent.